OPINION OF THE COURT
Martin B. Stecher, J.
This action for an injunction and for damages for breach of privacy is a matter of first impression in this State, and so far as I am able to ascertain, a matter of first impression in the United States. It arises out of the publication, verbatim, by a psychiatrist of a patient’s disclosures during the course of a lengthy psychoanalysis. I have made and filed detailed findings of fact which are briefly summarized here.[1]
Dr. Joan Roe is a physician who has practiced psychiatry for more than 50 years. Her husband, Peter Poe, has been a psychologist for some 25 years. The plaintiff and her late, former husband were each patients of Dr. Roe for many years. The defendants, eight years after the termination of treatment, published a book which reported verbatim and extensively the patients’ thoughts, feelings, and emotions, their sexual and other fantasies and biographies, their most intimate personal relationships and the disintegration of their marriage. Interspersed among the footnotes are Roe’s diagnosis of what purport to be the illnesses suffered by the patients and one of their children.
The defendants allege that the plaintiff consented to this publication. This defense is without substance. Consent was sought while the plaintiff was in therapy. It was never obtained in writing. In Dr. Roe’s own words consent "was there one day and not there another day. That was the nature of the illness I was treating, unreliable.” I need not deal with the value of an oral waiver of confidentiality given by a patient to a psychiatrist during the course of treatment. It is sufficient to *205 conclude that not only did the defendants fail to obtain the plaintiffs consent to publication, they were well aware that they had none.
The plaintiff seeks to prevail on any or all of four theories: that violation of CPLR 4504 (subd [a]) gives rise to a cause of action;[2] that the provisions of section 6509 of the Education Law and the regulations of the Commissioner of Education (8 NYCRR 60.1 [d] [3])[3] establish a public policy whose breach gives rise to a cause of action in tort; that the physician-patient relationship is contractual and in it there is implied the physician’s promise to obey the Hippocratic oath[4] whose violation gives rise to a cause of action for breach of contract; and, finally, "in light of the expanding recognition of invasion of privacy actions” (Doe v Roe, 42 AD2d 559, 560, affd 32 NY2d 902, cert granted 417 US 907, cert dsmd 420 US 307) a separate cause of action exists for unreasonably publicizing elements of plaintiffs life which ought to have been left in confidence.
The defendants contend not only that there was no unlawful disclosure, the patient’s identity having been fully concealed, but that no right of action exists even if the plaintiff is recognizable in this volume. The defendants assert that neither the "evidentiary privilege” contained in CPLR 4504 (subd [a]) nor the regulations of the Commissioner of Education, by their history, are intended to give rise to a cause of action for their violation; that the only cause of action for invasion of privacy recognized in the State of New York is the statutory *206 cause of action set forth in sections 50 and 51 of the Civil Rights Law; that the invasion of privacy concept as developed in the Federal courts and elsewhere is a constitutional guarantee of a right to privacy against intrusion by governments and has no reference to non-State action; that the volume in question is of such scientific merit that the professional need which it fills transcends the patient’s right of nondisclosure; that the plaintiff is guilty of laches in bringing this action; and, finally, that the defendants’ right to publication is protected by the First Amendment to the United States Constitution.
The few New York cases dealing with a physician’s unauthorized disclosure of a patient’s confidences usually turn on other issues, restrict themselves for the most part to a discussion of the effect of the current evidentiary statute (CPLR 4504, subd [a]) or its predecessor (Civ Prac Act, § 352) and in their dicta reach contradictory conclusions. In Munzer v Blaisdell (183 Misc 773, affd 269 App Div 970) a patient in a State psychiatric institution sued its director for unauthorizedly releasing his case record in violation of the Mental Hygiene Law. The cause of action founded on section 352 of the Civil Practice Act was dismissed because there was no physician-patient relationship between the parties. The court did, however, offer the opinion (p 775) that "where the statutory duty is violated, the patient is entitled to redress; for it is well settled that, where a positive duty is imposed by statute, a breach of that duty will give rise to a cause of action for damages on the part of the person for whose benefit the duty was imposed; and, in such cases, if the statute itself does not provide a remedy, the common law will furnish it. Willy v. Mulledy 78 N. Y. 310, 314; Racine v. Morris, 201 N. Y. 240, 244; Amberg v. Kinley, 214 N. Y. 531, 535; 3 Cooley on Torts [4th ed.], § 477, p 361.) This principle was recognized by the decision of the Appellate Division in the case at bar (see Munzer v. Blaisdell, 268 App. Div. 9).”
In Clark v Geraci (29 Misc 2d 791), the court found that the patient had waived the privilege and stated in a dictum that CPLR 4504 (subd [a]), section 6509 of the Education Law and the regulations issued thereunder (8 NYCRR 60.1 [d] [3]) provided no cause of action for breach of confidentiality. Felis v Greenberg (51 Misc 2d 441) on the other hand expresses the view that such disclosure gives rise to a cause of action but turns on the sufficiency of a pleading alleging the publication *207 of false information. Curry v Corn (52 Misc 2d 1035) suggests that violation of CPLR 4504 (subd [a]) was not intended by the Legislature to create an independent cause of action; but there the physician’s disclosure was to the plaintiff’s husband and the court held that a husband is entitled, as a matter of right, to be informed of his wife’s medical condition. In Hammer v Polsky (36 Misc 2d 482) the court, in a dictum, said that neither section 352 of the Civil Practice Act nor the regulations issued under the Education Law will support a cause of action; but as in Munzer v Blaisdell (183 Misc 777) recovery was denied on the ground that no physician-patient relationship was alleged to have existed.
The most frequently cited cases arising in other jurisdictions suffer from the same limitations. Although in Smith v Driscoll (94 Wash 441, 442) the court said that "for so palpable a wrong, the law provides a remedy,” the case turned on a question of pleading. A dictum in Simonsen v Swenson (104 Neb 224) suggests the availability of a remedy for violation of the duty of secrecy, but the issue involved what the court held to be a limited right of disclosure of the existence of a communicable disease. The court in Berry v Moench (8 Utah 2d 191) expressed the opinion that violation of evidentiary statutes gives rise to a cause of action, but like Felis v Greenberg (supra) the action was for libel, the issue turning on whether or not the physician’s disclosures were truthful. Alexander v Knight (197 Pa Super Ct 79) similarly contains such dicta, but the action was for personal injuries sustained in an automobile accident.
In Hague v Williams (37 NJ 328, 336) the court states that despite the absence of a common-law physician-patient privilege (cf. Matter of City Council of City of N. Y. v Goldwater, 284 NY 296; Buffalo Loan, Trust & Safe Deposit Co. v Knights Templar & Masonic Mut. Aid Assn., 126 NY 450, 455; Quarles v Sutherland, 215 Tenn 651; Ann., 20 ALR3d 1109; Clark v Geraci, 29 Misc 2d 791, supra; 8 Wigmore, Evidence [3d ed], § 2380) "[a] patient should be entitled to freely disclose his symptoms and condition to his doctor in order to receive proper treatment without fear that those facts may become public property” and that a physician "was under a general duty not to disclose frivolously the information received from [the patient], or from an examination of the patient.” The court, however, concluded that a physician was perfectly justified in disclosing to an insurer the heart condition of a *208 child whose parents had applied for a policy of life insurance on that child’s life.
None of the post Civil Practice Act cases had considered the effect of the repeal of section 354 of the Civil Practice Act. Section 352 of the Civil Practice Act which prohibited disclosure, was carried forward verbatim into the new statute (CPLR 4504, subd [a]). Section 354 of the Civil Practice Act limited the application of section 352 providing in part that it applied "to any examination of a person as a witness,” but this language was excluded from the new statute leaving only the broad prohibition without limitation that "a person duly authorized to practice medicine * * * shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity”.
Were this case to turn exclusively on the application of CPLR 4504 (subd [a]) it might be argued that had the Legislature intended, on adoption of the Civil Practice Law and Rules, to create a new cause of action where none existed before (cf. Matter of City Council of City of N. Y. v Goldwater, supra), it would have said so explicitly. Obviously, this case does not depend on so limited an approach; but I am of the opinion that the Legislature, in excluding from the new statute the opening words of section 354 of the Civil Practice Act (quoted supra), intended to reinforce the public policy of this State expressed in numerous statutes and regulations (cf. CPLR 4504, subd [a]; 4507, 4508; Education Law, §§ 6509-6511; Mental Hygiene Law, § 15.13, subds [c], [d]; § 35.11; Public Health Law, § 2803-c, subd 3, par f; § 2805-e, subd 3; § 3371; 8 NYCRR 60.1 [d] [3]) prohibiting physicians, persons in allied fields and medical institutions from disclosing without authorization of the patient, information discovered in attending the patient. I believe it clear, from the statutory and regulatory schemes set forth above that the Legislature did not intend to confine the prohibition to trials and other formal hearings whose proceedings are governed by a practice act (cf. Matter of City Council of City of N. Y. v Goldwater, supra) but intended that " 'the statute [CPLR 4504, subd (a)] have a broad and liberal construction to carry out its policy’” (Matter of City Council of City of N. Y v Goldwater, supra, p 301, citing Buffalo Loan, Trust & Safe Deposit Co. v Knights Templar & Masonic Mut. Aid Assn., supra).
As hereafter indicated there are theories on which liability *209 may be predicated other than violation of the CPLR (4504, subd [a]) the licensing and disciplinary statutes (Education Law, § 6509 et seq.) and what I perceive as this State’s public policy. In two of the very few cases which have come to grips with the issue of wrongful disclosure by physicians of patients’ secrets (Hammonds v Aetna Cas. & Sur. Co., 243 F Supp 793; Horne v Patton, 291 Ala 701) the courts predicated their holdings on the numerous sources of obligation which arise out of the physician-patient relationship. In Hammonds (supra) an insurance carrier, defending an action brought by a patient of the physician, tricked the physician into revealing confidential data by telling him that the patient intended a medical malpractice action. Both physician and insurance carrier were held liable in damages for the wrongful disclosure on theories of public policy;[5] the privileged communication statute; the State licensing statute; the implied covenant not to disclose whose breach is a contractual violation;[6] invasion of privacy and breach of a fiduciary duty to which a trust doctrine should be applied. The court was "of the opinion that the preservation of the patient’s privacy is no mere ethical duty upon the part of the doctor; there is a legal duty as well. The unauthorized revelation of medical secrets, or any confidential communication given in the course of treatment, is tortious conduct which may be the basis for an action in damages” (pp 801-802).
Horne v Patton (supra) was a case of first impression in Alabama, a State without a testimonial privilege statute, but which had a licensing statute (Ala Code, tit 46, § 257 [21]; now Ala Code, § 34-24-35, subd 14) which, like our own statute (Education Law, § 6509 et seq.) and regulations (8 NYCRR 60.1 [d] [3]) permitted revocation of the physician’s license for "[w]ilful betrayal of a professional secret”. The court (p 830) sustained the complaint seeking an injunction and damages and recognized the "right of a person to be free from unwarranted publicity or unwarranted appropriation or exploitation of one’s personality, publicization of one’s private affairs with *210 which the public has no legitimate concern, or the wrongful intrusion of one’s private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.” Its conclusions were also based on obligations arising from the Hippocratic oath and the principles of medical ethics of the American Medical Association;[7] the State licensing and disciplinary statute; the fiduciary nature of the relationship; and the implied covenant of secrecy in the contract between the parties. It held (p 829) that "public policy in Alabama requires that information obtained by a physician in the course of a doctor-patient relationship be maintained in confidence”. The court (pp 829-830) "concluded that a medical doctor is under a general duty not to make extra-judicial disclosures of information acquired in the course of the doctor-patient relationship and that a breach of that duty will give rise to a cause of action”.
I too find that a physician, who enters into an agreement with a patient to provide medical attention, impliedly covenants to keep in confidence all disclosures made by the patient concerning the patient’s physical or mental condition as well as all matters discovered by the physician in the course of examination or treatment. This is particularly and necessarily true of the psychiatric relationship, for in the dynamics of psychotherapy "[t]he patient is called upon to discuss in a candid and frank manner personal material of the most intimate and disturbing nature * * * He is expected to bring up all manner of socially unacceptable instincts and urges, immature wishes, perverse sexual thoughts — in short, the unspeakable, the unthinkable, the repressed. To speak of such things to another human requires an atmosphere of unusual trust, confidence and tolerance. * * * Patients will be helped only if they can form a trusting relationship with the psychiatrist.” (Heller, Some Comments to Lawyers on the Practice of Psychiatry, 30 Temple L Rev 401, 405-406.)
There can be little doubt that under the law of the State of New York and in a proper case, the contract of private parties to retain in confidence matter which should be kept in confidence will be enforced by injunction and compensated in *211 damages (Karpinski v Ingrasci, 28 NY2d 45; Bates Chevrolet Corp. v Haven Chevrolet, 13 AD2d 27, 16 AD2d 917, affd without opn 13 NY2d 644; Millet v Slocum, 4 AD2d 528, affd without opn 5 NY2d 734; Lynch v Bailey, 300 NY 615; Clark Paper & Mfg. Co. v Stenacher, 236 NY 312).
The contract between the plaintiff and Dr. Roe is such a contract. The contention that such enforcement of a private agreement not to disclose information received in confidence somehow offends the United States Constitution would seem to be disputed by implication in Kewanee Oil Co. v Bicron Corp. (416 US 470). The cases cited by the defendants in support of their theory that First Amendment rights are somehow involved do not support their contention. Time, Inc. v Hill (385 US 374) involves a right to publish a matter of general public interest. New York Times Co. v Sullivan (376 US 254) involved the right to publish matters critical of, or even offensive to, public officials. Reliance on the defamation cases (New York Times Co. v Sullivan, supra; Garrison v Louisiana, 379 US 64; Curtis Pub. Co. v Butts, 388 US 130; St. Amant v Thompson, 390 US 727; Gertz v Robert Welch, Inc., 418 US 323; Cox Broadcasting Corp. v Cohn, 420 US 469; Time Inc. v Firestone, 424 US 448; Chapadeau v Utica Observer-Dispatch, 38 NY2d 196) would appear to be misplaced. In none of them is a contractual duty to maintain a confidence involved. On the other hand, in United States v Marchetti (466 F2d 1309, cert den 409 US 1063) an agreement by an agent of the Central Intelligence Agency not to disclose information acquired during his service with the agency was sufficient to enjoin the publication in a book by Marchetti of matter reasonably deemed by the CIA to be in violation of that contract.
The complaint alleges a cause of action for breach of privacy under sections 50 and 51 of the Civil Rights Law. These statutes have not been violated for the defendants did not use the plaintiff’s "name, portrait or picture” in their book. We are not, of course, limited to the theory set forth in the complaint, but may consider any cause of action revealed by the pleadings and proof (Diemer v Diemer, 8 NY2d 206) and can even amend the pleadings on the court’s own motion after trial (Princiotto v Materdomini, 45 AD2d 883). A motion to amend this cause of action has been granted and a cause of action for breach of privacy has been established — if such a *212 cause of action is recognized in this State apart from the Civil Rights Law.
The expression "right of privacy” is not without confusion and has been applied to varying rights and causes of action. Among the cases cited by the plaintiff in support of its contention are Roe v Wade (410 US 113), Griswold v Connecticut (381 US 479) and Drake v Covington County Bd. of Educ. (371 F Supp 974). In each of these cases there is a judicial recognition that the individual has rights of privacy which may not be infringed upon by a government. Such right of privacy, of course, is not involved in this litigation.
In Nader v General Motors Corp. (25 NY2d 560, 572) a case decided under the law of the District of Columbia, Judge (now Chief Judge) Breitel, in a concurring opinion, said that "scholars in trying to define the elusive concept of the right of privacy, have, as of the present, subdivided the common law right into separate classifications, most significantly distinguishing between unreasonable intrusion and unreasonable publicity (Restatement, 2d, Torts, Tent. Draft No. 13 [April 27, 1967], §§ 652A, 652B, 652D; Prosser, Torts [3d ed.], pp. 832-837). This does not mean, however, that the classifications are either frozen or exhausted, or that several of the classifications may not overlap.” The Nader case is a classic case of "unreasonable intrusion.” At bar is a claim of "unreasonable publicity” (cf. Time, Inc. v Hill, 385 US 374, supra).
Ever since Roberson v Rochester Folding Box. Co. (171 NY 538), the courts of this State have held uniformly (cf. Waters v Moore, 70 Misc 2d 372) that no cause of action for invasion of privacy will be recognized apart from that authorized by sections 50 and 51 of the Civil Rights Law. Only this year the Appellate Division, First Department, reaffirmed this view (Wojtowicz v Delacorte Press, 58 AD2d 45).[8] Stated differently, to date there has not been recognized in this State a common-law right of privacy. The right of privacy urged here, however, is not a common-law right. The right of privacy with which we deal arises from two other sources: the public policy (discussed supra) of the State of New York proclaimed by statute (CPLR 4504, subd [a]; 4507, 4508; Education Law, §§ 6509-6511; Mental Hygiene Law, § 15.13, subds [c], [d]; § 35.11; Public Health Law, § 2803-c, subd 3, par f; § 2805-e, *213 subd 3; § 3371; 8 NYCRR 60.1 [d] [3]) which bars a physician from disclosing a patient’s confidences; and the implied promise of confidentiality which every physician makes to his patient. It is in this context that the Appellate Division, First Department, upheld and expanded the preliminary injunction previously granted in this case saying "[i]n light of the expanding recognition of invasion of privacy actions [citing cases] and in view of the confidentiality accorded the physician-patient relationship, we believe that plaintiff has alleged a cognizable claim for relief’ (Doe v Roe, 42 AD2d 559, 560).
Every patient, and particularly every patient undergoing psychoanalysis, has such a right of privacy. Under what circumstances can a person be expected to reveal sexual fantasies, infantile memories, passions of hate and love, one’s most intimate relationship with one’s spouse and others except upon the inferential agreement that such confessions will be forever entombed in the psychiatrist’s memory, never to be revealed during the psychiatrist’s lifetime or thereafter? The very needs of the profession itself require that confidentiality exist and be enforced. As pointed out in Matter of Lifschutz (2 Cal 3d 415, 421) "a large segment of the psychiatric profession concurs in Dr. Lifschutz’s strongly held belief that an absolute privilege of confidentiality is essential to the effective practice of psychotherapy” (cf. Ann., 20 ALR3d 1109-1112). Despite the fact that in no New York case has such a wrong been remedied due, most likely, to the fact that so few physicians violate this fundamental obligation, it is time that the obligation not only be recognized but that the right of redress be recognized as well.
What label we affix to this wrong is unimportant (although the category of wrong could, under certain circumstances— such as determining the applicable Statute of Limitations — be significant). " Tt is generally accepted that "There is no necessity whatever that a tort must have a name. New and nameless torts are being recognized constantly”. (Prosser, Torts [2d ed.], p. 3.) What is important is that there must be the infliction of intentional harm, resulting in damage, without legal excuses or justification. (See Aikens v. Wisconsin, 195 U. S. 194, 204; Rager v. McCloskey, 305 N. Y. 75, 81; Ruza v. Ruza, 286 App. Div. 767, 769; Knapp Engraving v Keystone Photo, [1 AD2d 170].)’ ” (Morrison v National Broadcasting Co., 24 AD2d 284, 291, quoting Penn-Ohio Steel Corp. v Allis-Chalmers Mfg. Co., 7 AD2d 441, 443-444.)
*214 The defendants contend that the physician’s obligation of confidentiality is not absolute and must give way to the general public interest. The interest, as they see it in this case, is the scientific value of the publication.
It is not disputed that under our public policy the right of confidentiality is less than absolute. The evidentiary statute itself (CPLR 4504, subd [a]) contains its own exceptions. Despite the duty of confidentiality courts have recognized the duty of a psychiatrist to give warning where a patient clearly presents a danger to others (Tarasoff v Regents of Univ. of Cal., 529 P2d 553, 555 [Sup Ct Cal], to disclose the existence of a contagious disease [P.H.L. 2101]; Hoffmann v Blackmon, 241 So 2d 752 [Fla]; Wojcik v Aluminum Co. of Amer., 18 Misc 2d 740), to report the use of "controlled substances” in certain situations (Public Health Law, §§ 3355, 3373), and to report gunshot and other wounds (Penal Law, § 265.25). In no case, however, has the curiosity or education of the medical profession superseded the duty of confidentiality. I do not reach the question of a psychiatrist’s right to publish case histories where the identities are fully concealed[9] for that is not our problem here, nor do I find it necessary to reach the issue of whether or not an important scientific discovery would take precedence over a patient’s privilege of nondisclosure. I do not consider myself qualified to determine the contribution which this book may have made to the science or art of psychiatry. I do conclude, however, that if such contribution was the defendants’ defense they have utterly failed in their proof that this volume represented a major contribution to scientific knowledge. The evidence is to the contrary and this defense must necessarily fail.
Nor is the argument available that by enjoining the further distribution of this book the court will be engaging in a "prior restraint” on publication. The Supreme Court long ago recognized that "liberty of speech, and of the press, is *215 * * * not an absolute right, and the State may punish its abuse” (Near v Minnesota, 283 US 697, 708). That the action contemplated here is not a "prior restraint” is clear. In Kingsley Books v Brown (354 US 436) Justice Frankfurter distinguished prior restraint from the situation at bar. Contrasting the unconstitutional statute in Near v Minnesota (supra) with the New York statute (Code Grim Pro, § 22-a, now CPLR 6330), Justice Frankfurter said (p 445), "The two cases are no less glaringly different when judged by the appropriate criteria of constitutional law. Minnesota empowered its courts to enjoin the dissemination of future issues of a publication because its past issues had been found offensive. In the language of Mr. Chief Justice Hughes, 'This is of the essence of censorship.’ 283 U. S., at 713. As such, it was found unconstitutional. This was enough to condemn the statute wholly apart from the fact that the proceeding in Near involved not obscenity but matters deemed to be derogatory to a public officer. Unlike Near, § 22-a is concerned solely with obscenity and, as authoritatively construed, it studiously withholds restraint upon matters not already published and not yet found to be offensive.”
There is no prior restraint in the case at bar. The book has been published and it does offend against the plaintiff’s right of privacy, contractual and otherwise, not to have her innermost thoughts offered to all for the price of this book. There is no prior restraint and, therefore, no censorship within constitutional meaning.
As I have indicated in the separately filed findings of facts, the defense of laches is groundless. Publication occurred 10 years after Dr. Roe last discussed the book with the plaintiff, eight years after treatment stopped. As soon as the plaintiff heard of the impending publication, she protested, orally through a mutual friend and in writing through her attorney. Dr. Roe’s evasive and misleading answer to the attorney should serve to still any claim of laches.
The liability of Dr. Roe to respond in damages is clear; and Mr. Poe’s liability is equally clear. True, he and the plaintiff were not involved in a physician-patient relationship and he certainly had no contractual relationship to her. But, the conclusion is unassailable that Poe, like anyone else with access to the book, knew that its source was the patient’s production in psychoanalysis. He knew as well as, and perhaps better than Roe, of the absence of consent, of the failure *216 to disguise. If anyone was the actor in seeing to it that the work was written, that it was manufactured, advertised and circulated, it was Poe. He is a coauthor of the book and a willing, indeed avid, coviolator of the patient’s rights and is therefore equally liable (Hammonds v Aetna Cas. & Sur. Co., 243 F Supp 793, supra).
The plaintiff seeks punitive damages and suggests that a proper measure of those damages, in addition to compensatory damage, is approximately $50,000, the sum plaintiff has thus far expended on and incurred for attorneys’ fees. (Given the history of this action with appeals to the United States Supreme Court, it is reasonable to assume that she shall continue to incur expenses.) Under the English rule, an allowance of costs to the prevailing party includes attorneys’ fees assessed by the court. Early in the judicial history of the United States, this country and nearly all if not all, jurisdictions within it, determined that except for extraordinary circumstances, attorneys’ fees were not a proper element of costs unless provided for by statute. It has been held that in the Federal courts where jurisdiction is attained other than by diversity of citizenship, attorneys’ fees may be awarded under general Federal equity jurisdiction where a losing litigant has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons” (Hall v Cole, 412 US 1, 5; to the same effect see International Assn, of Machinists v Texas Steel Co., 538 F2d 1116; Vaughan v Atkinson, 369 US 527, 530; Universal Oil Co. v Root Refining Co., 328 US 575, 580; Rich Co. v Industrial Lbr. Co., 417 US 116, 129-130; see, contra, Alyeska Pipeline Co. v Wilderness Soc., 421 US 240, revg Wilderness Soc. v Morton, 495 F2d 1026). It would appear that as punitive damages or otherwise, attorneys’ fees are not available in this case there being no statutory authority providing for them. (City of Buffalo v Clement Co., 28 NY2d 241, 262-263.)
In order to warrant an award of punitive damages, it must have been affirmatively demonstrated that the wrong committed was willful and malicious, that the act complained of was "morally culpable or * * * actuated by evil and reprehensible motives not only to punish the defendant but to deter him as well as others” (Walker v Sheldon, 10 NY2d 401, 404). Where the act complained of is willful, malicious and wanton, punitive damages are sometimes available to "express indignation at the defendants’ wrong rather than a value set on plaintiff’s loss” (Gostowski v Roman Catholic Church, 262 NY *217 320, 324-325). Certainly, the acts of the defendants here are such as to warrant an expression of indignation and punishment for the purpose of deterring similar acts by these defendants or others. The difficulty, however, is that the defendants’ acts were not willful, malicious or wanton — they were merely stupid. I have no doubt that the defendants were of the opinion that they had sufficiently concealed the identity of the plaintiff and her family. I have no doubt that in addition to the commercial success they hoped to have, they believed that they were rendering a public service in publishing what they considered an in depth description of the plaintiff’s family. But there was no motive to harm. Under these circumstances, punitive damages are not available.
On turning to compensatory damages, we are confronted by the defendants’ contention that the information concerning the book acquired by the plaintiff’s university students and colleagues be excluded from consideration. They argue that these people acquired their information as a consequence of newspapers reporting the filing of this suit. They say, inferentially, that had plaintiff not brought this action she would have been spared that particular embarrassment, and therefore, having brought the action, she must bear its consequences.
This argument must be rejected for the same reason we reject the demand for attorneys’ fees. An underlying principle of American law is that a person having a cognizable claim is entitled or even encouraged to pursue that claim in the courts and that which discourages a person from seeking redress, such as the imposition of substantial costs as a penalty for losing his suit, is rejected. (Cf. Alyeska Pipeline Co. v Wilderness Soc., 421 US, at p 251). So it is here. The plaintiff clearly had a meritorious cause of action and we encourage her to assert her rights. If a consequence of that assertion of rights was further damaging publicity, the loss must fall, not on the plaintiff, but on the defendants, whose conduct made this lawsuit necessary. The wrongful publication and not the commencement of suit was the proximate cause of the damage.
The plaintiff has suffered damage as a consequence of this publication. She suffered acute embarrassment on learning the extent to which friends, colleagues, employer, students and others, had read or read of the book. Her livelihood, as indicated in the findings, was threatened; but fortunately, the actual cash loss was only some $1,500. Medical attention, *218 principally treatment with Dr. Lowenfeld, cost an additional $1,400. But beyond these sums the plaintiff suffered in health. She had insomnia and nightmares. She became reclusive as a consequence of the shame and humiliation induced by the book’s publication and her well-being and emotional health were significantly impaired for three years. In my opinion the fair and reasonable value of the injury she sustained — to the extent it can be compensated in damages — is $20,000.
Damages, of course, do not provide an adequate remedy; for should the book circulate further, beyond the 220 copies already sold, the damage must accrue anew. The plaintiff is entitled to a judgment permanently enjoining the defendants, their heirs, successors and assigns from further violating the plaintiff’s right to privacy whether by circulating this book or by otherwise disclosing any of the matters revealed by the plaintiff to Dr. Roe in the course of psychotherapy. On settlement of the judgment suggestions will be entertained concerning the disposition of any remaining volumes or parts thereof.

. By prior order this file has been sealed from indiscriminate viewing and pseudonyms have been used in the title of the action and in the other documents. I see every reason to continue that arrangement (cf. Munzer v Blaisdell, 268 App Div 9).

. CPLR 4504 (subd [a]) provides in part: "Unless the patient waives the privilege, a person authorized to practice medicine * * * shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity.”

. Subdivision (9) of section 6509 of the Education Law provides: "Each of the following is professional misconduct: * * * (9) Committing unprofessional conduct, as defined by the board of regents in its rules or by the commissioner in regulations approved by the board of regents.”
8 NYCRR 60.1 (d) (3) provides in part, "Unprofessional conduct in the practise of medicine shall include * * * the revealing of facts, data or information obtained in a professional capacity relating to a patient or his records without first obtaining the consent of the patient”.

. Every physician is presumed to have taken the oath of Hippocrates [460? — 377? B. C.] which states in part, "I will abstain [in treating patients] * * * from whatever is deleterious and mischievous. * * * Whatever, in connection with my professional practise, or not in connection with it, I may see or hear in the lives of men which ought not to be spoken abroad I will not divulge, as reckoning that all such should be kept secret.”

. "[w]hen a course of conduct is cruel or shocking to the average man’k conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute, or decree of court” (p 796).

. "[ajlmost every member of the public is aware of the promise of discretion contained in the Hippocratic Oath, and every patient has a right to rely upon this warranty of silence. The promise of secrecy is as much an express warranty as the advertisement of a commercial entrepreneur” (p 801).

. "A physician may not reveal the confidences entrusted to him in the course of medical attendance, or the deficiencies he may observe in the character of patients, unless he is required to do so by law or unless it becomes necessary in order to protect the welfare of the individual or of the community.” (American Med Assn., Principles of Medical Ethics, 1957, § 9.)

. It has been predicted (Galella v Onassis, 487 F2d 986, 995) that the New York Court of Appeals, when again faced with the issue, will abandon Roberson v Rochester Folding Box Co. (supra), but this case need not turn on such prediction.

, It is interesting to observe that a leading professional organization, The Group for the Advancement of Psychiatry, in its Report No. 45 [New York, NY, 1960] concurs in the conclusion that conflicts between ethical obligations and scientific advance must be resolved in favor of the ethical consideration. It said,
"When the psychiatrist describes the details of the life history of his patient, his job problems, et cetera, the possibility of recognition is very high.
"For this reason clinical data may have to be disguised with consequent impairment of the objective scientific value. Sometimes material may be so impossible to camouflage that it should not be published at all, in spite of its scientific value.
"Such ethical requirements take priority over research objectives.”