[662 NYS2d 550]

Monique Wheeler et al., Appellants, v Commissioner of Social Services of the City of New York et al., Defendants, and Graham Windham Services for Family and Children, Respondent.

Second Department, September 22, 1997

## APPEARANCES OF COUNSEL

*Weiss & Rosenbloom, P. C.,* New York City *(Barry D. Weiss* of counsel), for appellants.

*Gordon & Silber, P. C.,* New York City *(David Henry Sculnick* of counsel), for respondent.

## OPINION OF THE COURT

ROSENBLATT, J. P.

The case before us involves the confidentiality of records kept under Social Services Law § 372.

When she was just under 13 years old the plaintiff Monique Wheeler (hereinafter the plaintiff) was placed in a group home owned and operated by the defendant Graham Windham Services for Family and Children (hereinafter Graham Windham).

She has commenced this action against Graham Windham[1] and the defendant City agencies that brought about her placement.[2] As against Graham Windham she alleges negligent supervision in allowing her to leave the home late at night on

---

1. The plaintiff's mother has brought a derivative action and is also an appellant, but for ease of referral we limit our discussion to the plaintiff Monique Wheeler.

2. The placement was made on the strength of an order of the Family Court, Kings County, by which Monique was designated a person in need of supervision *(see,* Family Ct Act art 7) and was given over to the custody of the New York City Department of Social Services, which in turn placed her with Graham Windham. The plaintiffs' claims against the defendant Commissioner of Social Services of the City of New York and the Department of Human Resources of the City of New York involve allegations that the City

May 30, 1992, following which she was reportedly raped during the early morning hours of the next day. For an appreciable period of time thereafter the plaintiff continued to reside at Graham Windham.

This appeal involves the plaintiff's motion for the production and inspection of all her own medical and psychological records in Graham Windham's custody. She asserts that the records will fortify her damages claim. The case falls under the general rubric of discovery; what makes it noteworthy is that the defendant Graham Windham, which is the custodian of the records pursuant to Social Services Law § 372, has, among other things, raised the claim of confidentiality.

Often, the assertion that medical or psychological records are confidential is raised by the person who is the subject of the records, i.e., the patient; here, the plaintiff. In this case, the defendant custodian has raised the claim against the patient. Because the question involves the interplay of several statutes and competing considerations, we will address the extent to which such discovery is appropriate, and the procedure by which it is best conducted.

The Supreme Court ordered Graham Windham to produce the plaintiff's records for in camera inspection so as to determine which records were discoverable. It then issued an order dated April 22, 1996, directing Graham Windham to turn over only a six-page "Incident Report dated May 31, 1992", and a "UCR Face Sheet/Request/Notification/Authorization form dated April 17, 1995 consisting of nine pages". The plaintiff moved to reargue, claiming that the court issued the order dated April 22, 1996, without a hearing, and that she was thereby deprived of an opportunity to participate meaningfully in the discovery process.

The Supreme Court granted the motion to reargue, but denied the plaintiff's request for a hearing, ruling that she had failed to demonstrate that Social Services Law § 372 (3) (allowing for the discovery of social services agencies' records) mandates that an evidentiary hearing be held following the court's in camera inspection of the records.

Graham Windham does not dispute that it is obliged under Social Services Law § 372 to generate and keep records of those

---

agencies were negligent in placing Monique with Graham Windham. The City agencies are not involved in this appeal, which deals only with the plaintiffs' motion for the discovery of records in the custody of the codefendant Graham Windham.

who are placed in its care. Over the years, the Legislature has recognized that these records deserve an appropriate degree of confidentiality, considering that they must contain individualized and often highly personal information about the residents. A degree of confidentiality was at least implied in the early enactments *(see,* L 1884, ch 438, § 3; L 1894, ch 54, § 1), and under ensuing statutes the Legislature expressly declared the records confidential (L 1924, ch 437, § 1, amending State Charities Law § 301). Throughout the long evolution of the provisions that have governed such record keeping, the Legislature has continued to preserve confidentiality and to limit disclosure *(see,* L 1934, ch 802; L 1985, ch 880) up through the most recent relevant amendment of Social Services Law § 372 in 1993 (L 1993, ch 394).

In the decisional law relating to the discovery of these records, it has often been the agencies and institutions that have sought to safeguard the confidentiality of the records of their residents/patients from the reach of various third persons such as litigants *(see, Quillen v State of New York,* 191 AD2d 31; *Matter of Wasserstein v Warwick State Training School for Boys,* 54 Misc 2d 948), and even foster parents *(Matter of Louis F.,* 42 NY2d 260). Here, the question is complicated by the stance of Graham Windham, which has raised this claim of confidentiality not against third persons, but against the resident/patient herself.

There is a dearth of authority on the question of a resident/patient's entitlement to her own medical records kept by a residential home or agency pursuant to Social Services Law § 372. The question is further complicated by the plaintiff's proposed use of the records against Graham Windham in her action to recover damages from Graham Windham. Both sides have focused on the confidentiality provisions of Social Services Law § 372 (4) based on court decisions issued prior to the 1993 amendment of that statute. In 1993, however, the Legislature continued to characterize these records as confidential, but for the first time made the discovery of those records "subject to the provisions of article thirty-one of the civil practice law and rules" (L 1993, ch 394, § 1; Social Services Law § 372 [3]).

The Legislature's motivation for shifting the accessibility of records protected by Social Services Law § 372 to the CPLR article 31 discovery theater is important, and bears on the appeal before us. In a memorandum of support for the bill by which the amendment was initiated, the following appears in the "JUSTIFICATION" paragraph to Assembly Bill A 6345:

"JUSTIFICATION: Section 372 was enacted to protect the confidentiality of social services records regarding children and parents. *It has, however, also been used to prevent children and parents from obtaining access to their own records.* In addition, recent amendments to the Family Court Act (Section 1038) and the Social Services Law (Sections 384-b, 392, 409-e [4], 409-f), have given children and parents, and their attorneys, access to the records kept about them, especially when they are parties to litigation. This bill would clarify that those sections override the limitations of Section 372, and that parties involved in litigation may have access when necessary" (Assembly Mem in Support, Bill Jacket, L 1993, ch 394; emphasis supplied).

Senator Stephen Saland's memorandum also expands upon the interrelation of CPLR article 31 with the standard protective devices: "SUMMARY OF PROVISIONS: Section 1 of the bill amends Social Services Law Section 372 to clarify that foster care records regarding children are confidential but are subject to the provisions of Article 31 of the Civil Practice Law and Rules. (Pursuant to Family Court Act Section 1038, Article 31 of the CPLR also applies to child protective proceedings.) Thus, a parent or guardian for a child could move to obtain such records pursuant to a demand for discovery. An agency would be able to move for a protective order where some part of the record should not be produced" (Introducer's Mem in Support of Senate Bill S 4867-A, Bill Jacket, L 1993, ch 394).

We must therefore examine the arguments for and against discovery, within the scope of CPLR article 31.

### THE CONFIDENTIALITY OF MEDICAL RECORDS

CPLR article 31, which governs discovery, is limited by CPLR 4504, which addresses confidentiality of medical records in the context of the physician-patient privilege *(see, Williams v Roosevelt Hosp.,* 66 NY2d 391, 395).

Having pioneered the use of statutes to protect the confidentiality of medical records,[3] New York has been zealous in safeguarding those privacy concerns *(see, e.g.,* Mental Hygiene Law §§ 33.13 [confidentiality of clinical records], 33.16 [qualified persons' access to clinical records]; Public Health Law

---

**3.** In 1828 New York was the first State to codify the physician-patient privilege (2 Rev Stat of NY, part III, ch VII, tit III, art Eighth, § 73 [1929 ed]), which was unknown at common law *(see,* Note, *Developments in the Law—Privileged Communications,* 98 Harv L Rev 1450, 1460 [1985]). The records of psychologists (CPLR 4507) and social workers (CPLR 4508) are also included within the scope of the physician-patient privilege.

§ 2805-g [3] [confidentiality of hospital records]; 8 NYCRR 29.1 [b] [8] [professional obligations]; 10 NYCRR 405.10 [a] [5] [confidentiality of hospital records]; Public Health Law § 18 [6] [confidentiality of information disclosed to third persons]; *see also, Rockland County Patrolmen's Benevolent Assn. v Collins,* 225 AD2d 534; *see generally,* Vilensky, *New York Law on Confidentiality of Medical Records, Parts I & II,* 66 NY St B J, No. 1, at 38 [Jan. 1994], No. 2, at 24 [Feb. 1994]).

The doctrine of confidentiality is based on a well-accepted premise: The patient whose privacy and sensibilities are safeguarded will be the more likely to reveal information that will result in improvement or cure. This benefits the individual and, in turn, the community and, ultimately, the population. This rationale does not advance Graham Windham's claim, considering that it is not Graham Windham but the patient, as the subject of the records, who enjoys the confidentiality of the records. The privilege, as the Court of Appeals put it, belongs only to the patient *(Dillenbeck v Hess,* 73 NY2d 278, 289). Although qualified parties may invoke the privilege *(see,* CPLR 3101 [b]), they do so on the patient's behalf *(Matter of Grand Jury Investigation of Onondaga County,* 59 NY2d 130, 135), and it is for the patient and no one else to decide whether to waive confidentiality *(see,* CPLR 4504 [a]).

Because it is Graham Windham, not the plaintiff, asserting confidentiality, we must measure Graham Windham's assertion against the plaintiff's rights.

### THE RIGHT OF ACCESS OF A PERSON TO HIS OR HER OWN MEDICAL RECORDS

Under New York law, patients and those similarly situated have generally been entitled to court orders granting them access to their medical records for purposes of litigation.

This is obviously true in instances in which litigation has actually been commenced *(see, e.g., Thomas v State of New York,* 197 Misc 288; *see also, Cynthia B. v New Rochelle Hosp. Med. Ctr.,* 60 NY2d 452, 457), and it is even true when litigation is merely contemplated *(see, e.g., Matter of Hernandez v Lutheran Med. Ctr.,* 104 AD2d 368; *Matter of Scipione v Long Is. Jewish-Hillside Med. Ctr.,* 118 Misc 2d 324; *Matter of Kaplan v North Shore Univ. Hosp.,* 117 Misc 2d 734; *see also,* CPLR 3102 [c]; Annotation, *Propriety of State Court's Grant or Denial of Application for Pre-Action Production or Inspection of Documents, Persons, or Other Evidence,* 12 ALR5th 577, 598-600, § 6 [medical records]).

The decisional law as to this type of discovery has been based, by and large, on statutory grounds, although there have been some lower court judicial expressions to the effect that a person has a nonstatutory, inherent right of reasonable access to his or her own medical records *(see, Matter of Glazer v Department of Hosps.,* 2 Misc 2d 207; *People v Muldrow,* 96 Misc 2d 854). It has been variously described as a "property right" *(Matter of Gerkin v Werner,* 106 Misc 2d 643, 644; *see, Matter of Striegel v Tofano,* 92 Misc 2d 113, 116; *Matter of Casillo v St. John's Episcopal Hosp.,* 151 Misc 2d 420, 422; *Pyramid Life Ins. Co. v Masonic Hosp. Assn.,* 191 F Supp 51, 54) or a "common law patient access right" (Comment, *Toward a Uniform Right to Medical Records: A Proposal for a Model Patient Access and Information Practices Statute,* 30 UCLA L Rev 1349, 1364 [1983]).[4] The Court of Appeals, however, has never expressly recognized a common-law right that allows a patient unrestricted access to his or her own medical records *(see, Cynthia B. v New Rochelle Hosp. Med. Ctr., supra,* at 460, n 3), nor has such a right been recognized under Federal constitutional law *(see, Gotkin v Miller,* 514 F2d 125).

While CPLR article 31 is expansive in according a litigant access to his or her own medical records, the Court of Appeals has noted that "although patients may exercise a considerable degree of control over their records, there is no statute that expressly allows them to obtain direct and complete access to their medical records regardless of whether litigation is pending" *(Cynthia B. v New Rochelle Hosp. Med. Ctr., supra,* 60 NY2d, at 460, n 3). In making this observation, the Court of Appeals noted the existence of Public Health Law § 17, which provided patients with the right to have their medical records delivered to other health care providers. Subsequently, New York enacted Public Health Law § 18, which allows patients

4. For the earliest decisional law recognizing a common-law right of access to one's own medical records *(see, Wallace v University Hosps.,* 82 Ohio Law Abs 257, 164 NE2d 917, *mod* 84 Ohio Law Abs 224, 170 NE2d 261; *see also, Cannell v Medical & Surgical Clinic,* 21 Ill App 3d 383, 315 NE2d 278; *Hutchins v Texas Rehabilitation Commn.,* 544 SW2d 802 [Tex]). The subject has provoked comment both in New York *(see,* Kaiser, *Patients' Rights of Access to Their Own Medical Records: The Need for New Law,* 24 Buff L Rev 317 [1974-1975]) and in other jurisdictions *(see,* Kirby, International Commentaries: *A Patient's Right of Access to Medical Records,* 12 J Contemp Health L & Poly 93 [1995]).

greater access to their own medical records[5] *(see generally,* Serbaroli, Health Law, *Confidentiality of Medical Records—Part I,* NYLJ, June 1, 1994, at 3, col 1; Silber & Rabar, Medical Malpractice Litigation, *Access to a Patient's Records,* NYLJ, Sept. 30, 1994, at 3, col 1). The statute entitles patients to certain information concerning their health care, excluding the "personal notes" of the practitioner.[6]

The general theme is toward patient access to their own records, but there are a number of considerations that come into play, particularly with regard to psychological or psychiatric-type records.

### RECORDS OF PSYCHOLOGICAL OR PSYCHIATRIC CONTENT

In *Cynthia B. v New Rochelle Hosp. Med. Ctr. (supra,* at 460), the Court of Appeals stated that because there may be potential harm to a patient, medical records, particularly those involving psychiatric-type treatment, should not automatically and necessarily be disclosed to third persons, even upon a patient's waiver of the privilege of confidentiality under CPLR 4504. Because of the often sensitive nature of those kinds of records, disclosure is all the more restrictive, particularly disclosure to third parties *(see, MacDonald v Clinger,* 84 AD2d 482; *Doe v Roe,* 93 Misc 2d 201). *Cynthia B.,* although highly instructive, is different from the case before us in two critical ways. The records custodian in *Cynthia B.* resisted disclosure as a neutral, nonparty hospital, unrelated to Cynthia's malpractice action against others. Secondly, Cynthia B. waived the confidentiality privilege so that the malpractice defendants could gain access to her records and challenge her claims of psychological sequela. The plaintiff in our case, however, seeks her own records, so that she can further her own suit against the defendant custodian of those records, who would otherwise

---

5. Other States have enacted similar statutes *(see,* Contrubis, *Patient Access to Medical Records: A Statutory Survey of the United States,* CRS Report for Congress [Nov. 17, 1996]; Andrews & Jaeger, *Confidentiality of Genetic Information in the Workplace,* 17 Am J L & Med 75, 88 [1991]; Arnold, *Let Technology Counteract Technology: Protecting the Medical Record in the Computer Age,* 15 Hastings Comm & Ent L J 455, 471 [1993]; Gostin, Turek-Brezina, Powers, Kozloff, *Privacy and Security of Health Information in the Emerging Health Care System,* 5 Health Matrix 1, 27 [1995]).

6. This legislation was criticized by the executive branch on the ground that the right of access granted to patients was too restrictive and that the statute contained a "loophole" by which practitioners could refuse to disclose information they characterized as "personal notes", with no right by the patient to challenge that characterization in court (Governor's Mem approving L 1986, ch 498, 1986 McKinney's Session Laws of NY, at 3168).

have unequal access to them, should there be a damages phase of the trial. Hers is more than a waiver so that others can obtain this information; it is an outright quest, for her own benefit.

In *Cynthia B.*, the Court of Appeals considered fully any possible disservice or harm to Cynthia B. that the release of the records may have portended, and concluded that full disclosure was appropriate. The two features that distinguish our case from *Cynthia B.* argue all the more for disclosure. Although some cases have discussed therapeutic harm to the patient as a claimed basis for restricting a patient's access to his or her own records *(e.g., Wear v Walker,* 800 SW2d 99 [Mo App]; *Oliver v Harborview Med. Ctr.,* 94 Wash 2d 559, 561, 618 P2d 76, 78; *Hemmings v Freedom of Information Commn.,* 1996 Conn Super Lexis 3188 [Conn Super Ct, Dec. 4, 1996, McWeeney, J.]; *Jackson v Brinker,* 147 FRD 189, 200 [SD Ind 1993]; *see also,* Kapp, *Placebo Therapy and the Law: Prescribe With Care,* 8 Am J L & Med 371, 397 [1983]; Silber & Rabar, *Access to a Patient's Records,* NYLJ, Sept. 30, 1994, at 3, col 1), we know of no instance in which a court denied a patient plaintiff access on those grounds. Inasmuch as the plaintiff is presumptively entitled to her own records, only a powerfully compelling showing would justify the court in potentially restricting the damages proof in the plaintiff's lawsuit, against her own wishes, on the ground that it knows what is best for her.[7]

### THE PRIVACY OF THIRD PERSONS

When confronted with a patient's demand for discovery of his or her own records, the custodian of those records may make a convincing case for withholding or redacting information that implicates the confidentiality, privacy, or safety of third persons.

The reasons for redaction with regard to these concerns for third persons are generally more cogent than any that may be raised against the patient herself, in the name of confidentiality *(see, Sam v Sanders,* 80 AD2d 758, *affd* 55 NY2d 1008; *Mat-*

---

7. By referring to the damages phase of the lawsuit we do not mean in the slightest to suggest or imply that there will ever be such a phase. Nor do we express any approval of the merits of the plaintiffs' liability case. Graham Windham has asked us to consider the motion for discovery to be premature, and we recognize that it is heatedly contesting any liability given its status as a nonsecure facility. We are dealing with the issue because the point is an important one and because discovery issues that relate to possible damages are, as a rule, taken up before the liability phase, in the interests of efficiency.

ter of Carla L., 45 AD2d 375, 382; *Hemmings v Freedom of Information Commn., supra; see also,* Gostin, *Health Information Privacy,* 80 Cornell L Rev 451, 524, n 334 [1995]), and should be aired in the discovery procedure regarding the records.

### THE DISCOVERY PROCEDURE

The Supreme Court acted properly in its earlier order by which it directed Graham Windham to produce the plaintiff's records for in camera inspection. We are remitting the matter to the Supreme Court to follow a procedure that comports with CPLR article 31 for the discovery of records covered by Social Services Law § 372 and which provides an adequate basis for appellate review.

1. Based upon the plaintiff's motion, and the delivery of her records to the court for in camera inspection, the court should mark the records for identification, so that they may be subject to further review, if that is called for.

2. The court, in the presence of both sides, should identify the records, by date, and where possible, by the name of the person who made the record. In most instances it should be possible to do this without divulging the content of the particular record or breaching any confidentiality.

3. When the records are so marked, Graham Windham may seek a protective order pursuant to CPLR 3103 *(see, Cynthia B. v New Rochelle Hosp. Med. Ctr., supra,* at 462; *Matter of Carla L., supra,* at 382) by identifying those records, or portions of the records that it seeks to have withheld, or redacted, and setting forth its reasons.

4. The court should clearly specify the grounds for its denial or approval of disclosure with respect to each document or category of documents. In most instances, the court should be able to make these determinations unaided, but we note that it does have the authority to appoint a Referee *(see, Cynthia B. v New Rochelle Hosp. Med. Ctr., supra,* at 461) or a Law Guardian.

Although the verbatim content of any record should not be revealed prematurely, the court, to the extent feasible, should identify, in general terms, any record that Graham Windham seeks to have withheld or redacted by way of protective order. This will give the plaintiff an intelligent basis upon which to argue for disclosure.

Accordingly, the appeal from the order dated April 22, 1996 is dismissed as that order was superseded by the order dated

September 3, 1996, made upon reargument, the order dated September 3, 1996 is reversed, insofar as appealed from, on the law, the plaintiff's application for a hearing is granted, the order dated April 22, 1996 is modified, by adding a provision directing a hearing as to the discoverability of the documents delivered by Graham Windham for in camera inspection by the court, and the matter is remitted for further proceedings in accordance with this decision.

MILLER, O'BRIEN and RITTER, JJ., concur.

Ordered that the appeal from the order dated April 22, 1996 is dismissed as that order was superseded by the order dated September 3, 1996, made upon reargument; and it is further,

Ordered that the order dated September 3, 1996 is reversed, insofar as appealed from, on the law, the plaintiffs' application for a hearing is granted, the order dated April 22, 1996 is modified, by adding thereto a provision directing a hearing on the discoverability of documents delivered by Graham Windham Services for Family and Children to the court for in camera inspection, and the matter is remitted to the Supreme Court, Kings County, for further proceedings consistent herewith; and it is further,

Ordered that the plaintiffs are awarded one bill of costs.