[618 NYS2d 270]

U. S. REINSURANCE CORPORATION, Appellant, v LOIC R. HUM-
PHREYS, Respondent.

First Department, November 3, 1994

### APPEARANCES OF COUNSEL

*Robert W. Gottlieb* of counsel, New York City *(John F. Finnegan* and *James P. Tenney* on the brief; *Rosenman & Colin,* attorneys), for appellant.

*Blair C. Fensterstock* of counsel, New York City *(Daniel F. Markham* and *Christopher R. Alger* on the brief; *Sutherland, Asbill & Brennan,* attorneys), for respondent.

### OPINION OF THE COURT

WALLACH, J.

Plaintiff is a reinsurance intermediary, brokering over $70 million worth of such contracts in 1992, from which it earned commissions and fees of nearly $9.9 million. Reinsurance is a device which matches a primary (or "ceding") insurer with a secondary (or "assuming") insurer. The reinsurer becomes an indemnitor of the primary insurer, allowing the latter to reduce the amount of its cash reserves required to be held for the protection of policyholders, thus increasing the company's ability to underwrite other policies or make other investments.

According to plaintiff, over the course of nearly four years it developed a unique "finite risk catastrophe reinsurance" product, designed to be marketed at a reduced premium. The precise details of this reinsurance cover, designated the "U.S. Re Continuity Scheme", are confidential. Indeed, it is the asserted confidentiality of that information that is at the heart of this case. Generally, the scheme called for a portion of the reinsurance premium to be set aside by the reinsurer in a separate fund, which would be treated by the reinsured company for accounting purposes as an asset rather than an insurance expense. This fund would be tapped for payment of losses, and would be replenished by an additional premium should the balance become negative, but if no claims were

filed during the period of the contract, the balance would be refunded to the reinsured, with interest. An added feature of this scheme, which combined risk transfer with the principle of continuity on a spread loss basis, was an allowance for yearly cancellation by the reinsured. In 1992, at least 70% of plaintiff's total revenue was generated by or attributable to this Continuity Scheme.

In 1993 the Financial Accounting Standards Board changed the rules with respect to such finite risk covers by requiring that certain payments made by ceding companies under such arrangements would have to be treated, for accounting purposes, as liabilities rather than as assets. As a result, plaintiff devoted four months of its energies to developing a replacement, resulting in a package which it began marketing as the "U.S. Re Successor Product".

Plaintiff alleges that it has gone to great lengths to preserve the confidentiality of all data related to these proprietary products. Indeed, defendant, a corporate director of plaintiff who was one of the creators of these products (his attorney called them defendant's own "brainchild"), promoted the company policy of requiring employees to execute confidentiality agreements, and also played a key role in constructing a series of agreements to be executed by both ceding company clients and assuming reinsurers, in order to maintain confidentiality on the details and mechanics of the products.

On October 29, 1993, defendant resigned from the company on one day's notice, advising plaintiff's president and general counsel that he did not feel bound to observe confidentiality with respect to any information he had obtained through his employment and directorship, including the proprietary products at issue herein. The next day he appeared at an insurance trade association conference, handed out personal business cards, approached a number of plaintiff's clients, and was heard boasting that he would take about $1 million in brokerage commissions away from plaintiff.

Plaintiff's Employee Confidentiality Agreement prohibits disclosure of such data as "items in research or development, trade secrets * * * new products or new uses for old products", during a period which "is not limited in time to the duration of my employment but extends after my employment, irrespective of the reason for its termination." Defendant did not sign an Employee Confidentiality Agreement. He did execute a Director Confidentiality Agreement on January

10, 1992. But that agreement, designed to apply during the director's employment with the company and "thereafter", referred only to "information concerning the affairs, business clients, customers or other business relationships of the Company or * * * use of any such information for his own purposes or for the benefit of" others. All records and documents held by the director were to remain the property of plaintiff, but there was no specific reference to product nondisclosure.

In addition to claiming that defendant had anticipatorily breached his confidentiality agreement, plaintiff also alleged that defendant had breached a common-law fiduciary duty of loyalty as a former officer and director, and was threatening the misappropriation of trade secrets. In lieu of $10 million damages, plaintiff sought a permanent injunction against defendant's disclosure or use of the proprietary information.

Because it had commenced this action under an affidavit of emergency, plaintiff was initially able to obtain a temporary restraining order on November 3, 1993, and permission for short service of the summons and complaint, which was accomplished that very evening. Plaintiff's president told the court that risk of public disclosure precluded him from providing the details and mechanics of the proprietary reinsurance product in the pleadings. Five days later, on the eve of the return, plaintiff's president provided a "supplemental affidavit" in which he reemphasized how plaintiff had "zealously safeguarded the confidentiality" of the reinsurance scheme. All but five clients (ceding insurers), the court was told, had signed confidentiality agreements acknowledging their obligation not to disclose plaintiff's proprietary information, and four of those five had given oral assurances to that effect. The fifth was an account managed personally by defendant, and the lack of a confidentiality agreement from this client was only recently discovered by plaintiff.

In papers served on plaintiff in court on the morning of the return, defendant immediately took issue with the notion of any proprietary rights in the product, the uniqueness of the concept and the need for confidentiality, asserting that the entire scheme was nothing more than "a wonderful marketing plan to make clients believe that U.S. Re had some unique kinds of products by requiring confidentiality agreements." Defendant expressed "shock" that plaintiff's president now believed that the products were really confidential. Cross-moving to vacate the temporary restraining order, defendant

pointed to the absence of identification of any confidential matter in plaintiff's papers before the court.

On the afternoon of the return, plaintiff hand-delivered a letter to the court, urging that it not render a decision on the cross motion until plaintiff had an opportunity to respond. Three more letters followed over the next six days, urging retention of the temporary restraining order (TRO). Nevertheless, on November 19 the court vacated the TRO and denied the preliminary injunction, noting that "Plaintiff was not prepared to disclose the alleged confidential information and trade secrets, which serves as the basis for seeking a preliminary injunction."

Two days after entry of this order, plaintiff moved for renewal and reargument. To bolster the confidentiality argument, plaintiff submitted correspondence with clients on the subject, and even excerpts from letters written to clients by defendant himself. Affidavits from insurance executives were offered in support of the uniqueness of plaintiff's product. Most important, plaintiff repeated the offer it had made at the initial oral argument, that it was prepared to submit the proprietary products themselves for in camera review.

Reargument was denied on the ground that the court had neither overlooked or misapprehended relevant facts, nor misapplied controlling principles of law. Renewal was denied for failure to offer new facts which were either unknown or unavailable to plaintiff at the time of the earlier submission.

Plaintiff is entitled to preliminary injunctive relief if it can show a probability or likelihood of success on the merits, a danger of irreparable injury without such relief, and a balancing of the equities in its favor. Such a question is normally addressed to the discretion of the trial court (see, Aetna Ins. Co. v Capasso, 75 NY2d 860). We believe the IAS Court, in the exercise of its discretion, erred as a matter of law.

Restatement of Torts § 757, comment b, cited with approval by the Court of Appeals (Ashland Mgt. v Janien, 82 NY2d 395, 407), defines a trade secret as a formula, pattern, device or compilation of information used in one's business which confers a competitive advantage over those in similar businesses who do not know of or use it. Among the factors to be considered in determining whether there is a genuine trade secret are the amount of effort expended in developing the secret matter, the extent of measures taken to safeguard the secret, the extent to which the information is known outside

the business, and the possible value of the information to competitors. It is undisputed that considerable effort was expended in developing the U.S. Re Continuity Scheme and its Successor Product. Whether or not the scheme was a true innovation or just a marketing strategy, the record is replete with evidence of plaintiff's efforts to maintain confidentiality of the product. Evidence that the product was known and recognized throughout the industry was offered on the renewal. Finally, defendant's boast that, unbound by any pledge of confidentiality, he would take $1 million worth of business away from plaintiff, provides substantial proof of the value of this scheme to competitors in the industry.

Why this additional data was not offered on the original motion is less clear. Plaintiff did, after all, have time to submit four letters to the court in response to defendant's cross motion to vacate the TRO, but each merely reiterated arguments already made in the pleadings and moving papers. The excuse offered was that defendant's argument that the products in question were neither unique nor confidential nor proprietary caught plaintiff completely by surprise. With these three points now squarely at issue, the IAS Court should, at that point, have accepted plaintiff's suggestion to receive such evidence in camera *(Sybron Corp. v Wetzel,* 46 NY2d 197, 207). The existence of such factual disputes did not preclude the granting of temporary injunctive relief to maintain the status quo *(Sau Thi Ma v Xuan T. Lien,* 198 AD2d 186, 187, *lv dismissed* 83 NY2d 847)*,* where plaintiff demonstrated the probability of irreparable harm. Plaintiff also established a likelihood of success on the merits, and a balancing of the equities in its favor.

Under appropriate circumstances, a court has discretion to grant renewal even upon facts known to the movant at the time of the original motion *(Pinto v Pinto,* 120 AD2d 337, 338). While the court's denial of plaintiff's timely second application for an in camera review of the proofs demonstrating the character of the product as a trade secret may itself have been an abuse of discretion *(see, Martinez v Hudson Armored Car & Courier,* 201 AD2d 359, 361), having taken that stance, the court was bound to give full weight to plaintiff's substantial showing of the need for confidentiality. On this state of the record, the need for injunctive relief is overwhelmingly apparent.

Accordingly, the order of Supreme Court, New York County (William J. Davis, J.), entered February 23, 1994, which

denied renewal of plaintiff's prior motion seeking a preliminary injunction against defendant's use or disclosure of certain trade secrets having to do with such proprietary reinsurance products as the "U.S. Re Continuity Scheme" and the "U.S. Re Successor Product", should be reversed, on the law, renewal granted, and thereupon, preliminary injunctive relief should be granted, with costs. Plaintiff's appeal from the initial order of the same court and Judge, entered November 22, 1993, should be dismissed as moot in light of our disposition with respect to the order on the renewal motion.

MURPHY, P. J., ROSENBERGER, ROSS and RUBIN, JJ., concur.

Order, Supreme Court, New York County, entered February 23, 1994, reversed, on the law, with costs and disbursements, renewal and preliminary injunctive relief granted, and the appeal from the order of the same court and Justice, entered November 22, 1993, dismissed as moot, without costs and disbursements, as indicated.