OPINION OF THE COURT
Herman Cahn, J.
This is an action to enjoin and recover damages for defendants’ alleged unlawful misappropriation of plaintiffs’ confidential information and proprietary design for their “Hot Holder” silicone gloves, oven gloves which are heat resistant to 500 degrees Fahrenheit, and which have a left-hand and right-hand design.
Plaintiffs move for a preliminary injunction, enjoining defendants (1) from marketing or taking any action with respect to certain molds, sample molds and products (a) for the “Hot Holder” oven mitts that were made in connection with certain agreements between the parties relating to the development of those oven mitts, and (b) for the Silicone Zone “Two Hands” left- and right-handed silicone oven mitts, or any other products, designs or ideas produced, developed or derived from the trade secrets and/or confidential proprietary information that plaintiffs provided to defendants, or which were developed by defendants for plaintiffs pursuant to the agreements between them, including the molds, sample molds obtained from or produced for plaintiffs, sample products, information, specifications, designs, drawings, models, research and development materials, and (2) from violating the order dated May 28, 2004 by the Hong Kong Special Administrative Region Court, which precluded defendants from “disposing of, otherwise dealing with,” or “from advertising, selling or offering for sale any item made or to be made from the Molds.”
Plaintiffs also seek an attachment of assets of defendants Ricky and Ken Yeung and defendant Silicone Zone.
Background
Plaintiff Sylmark Holdings Limited alleges that it developed unique silicone oven mitts, the “Hot Holder” gloves. The gloves are unique because they are generally made in the shape of a *287 hand — either right or left hand, thus making it much easier to cook with them. Sylmark licensed to its subsidiary, plaintiff Great Products Limited, the rights to the intellectual property necessary to produce the Hot Holder gloves. (Complaint HIT 7-8.) Great Products had licensed to plaintiff Ideal Products, LLC the intellectual property rights to make the gloves and sell them through retail channels of distribution. (Id. IT 9.)
Defendant Silicone Zone International Limited, a Hong Kong company, and its United States affiliate, defendant Silicone Zone USA LLC, design and manufacture molds for silicone items. The individual defendants are the principals of those companies.
On October 29, 2002, defendant Silicone Zone and plaintiff Sylmark, and its affiliates, executed a confidentiality agreement in which they acknowledged that, in the course of their negotiations, each party may disclose confidential information, including business, product and technical information relating to its business, to the other. (Id. HIT 23-25; complaint, exhibit 3, HH 1-2.) They agreed that the recipient of such information was obligated to keep it confidential and restrict its use during the three-year term of the agreement, and for a period after termination of 24 months. (Id. 1i 26; complaint, exhibit 3, 1111 3-4.) Paragraph 6 of the confidentiality agreement prohibited the recipient of the information from disclosing it to a third party without written permission. (Complaint, exhibit 3, 1i 6.) In paragraph 13 of the confidentiality agreement, Silicone Zone agreed that “the pot holder and/or Silicone mitt disclosed by Sylmark is an invention created solely by Sylmark, and the ownership of such an invention shall remain solely the exclusive property of Sylmark.” (Complaint, exhibit 3, IT 13.)
On November 27, 2002, Sylmark Development, LLC, another affiliate of Sylmark, entered into a development agreement with Silicone Zone, pursuant to which Silicone Zone agreed to manufacture molds for Sylmark for its Hot Holder gloves. (Complaint 1T 30; complaint, exhibit 4.) In this agreement also, Silicone Zone agreed to keep confidential Sylmark’s intellectual property and business practices that were disclosed to it. (Complaint, exhibit 4, II 4.a.) Silicone Zone also acknowledged that any confidential information produced by Silicone Zone based on Sylmark’s confidential information shall be Sylmark’s property. (Id.) Sylmark Development subsequently assigned its rights under the development agreement to Sylmark. (Complaint If 30.)
Plaintiffs allege that, from January 2003 through May 2003, Silicone Zone produced two sets of molds for the Hot Holder *288 gloves, but that Sylmark determined each time that the design was wrong. Thereupon, Sylmark provided new specifications for the molds. (Id. 11 31.) In May 2003, Silicone Zone allegedly modified the molds to Sylmark’s specifications, and a set of molds was made that Sylmark was satisfied with. (Id.)
In June 2003, Sylmark and Silicone Zone entered into a mold development agreement for the manufacture of a set of 10 new molds for the Hot Holder gloves. The mold development agreement also contained a comprehensive confidentiality agreement, designed to keep the material that Sylmark disclosed confidential. Silicone Zone agreed to be liable for any unauthorized use, disclosure or access. (Complaint 11 33; complaint, exhibit 1, 111 [c].) In this agreement, Silicone Zone again acknowledged that Sylmark “exclusively owns on a worldwide basis, all right, title and interest in all Samples, Molds, Sample Products and Molds . . . and any modifications . . . thereto,” as well as the confidential materials, the information, plans and designs, provided by Sylmark, or created or provided by Silicone Zone in fulfillment of this agreement, and all intellectual property rights in the sample molds, the molds and the confidential materials. (Complaint 1Í1Í 34-35; complaint, exhibit 1,111 [d].) Further, in the mold development agreement, Silicone Zone acknowledged and agreed that:
“[T]he Molds, Sample Molds and Sample Products are to be used by it only pursuant to the Agreement and only for the account of [Sylmark], and [Silicone Zone] agrees that it will not use any Sample Molds, Sample Products or Molds to produce products for any person other than [Sylmark], or for any purpose other than those specifically permitted under this Agreement, or encumber any Sample Molds or Molds.” (Complaint, exhibit 1, f 1 [e].)
That same provision obligates Silicone Zone to promptly surrender to Sylmark all confidential materials, materials constituting intellectual property rights, sample molds, molds, sample products, and products (referred to as company materials), and not to retain any samples or copies of any of these things, or encumber them, without Sylmark’s prior written consent. (Id.) Paragraph 2 of the mold development agreement states that if Sylmark does not engage Silicone Zone to produce products on a commercial basis, all company materials shall be surrendered to Sylmark, in accordance with paragraph 1 (e).
Plaintiffs claim that Silicone Zone attempted to add a sentence at the end of paragraph 2 obligating Sylmark to order *289 at least 100,000 pairs of gloves within one year after the production of the molds or use Silicone Zone as its exclusive manufacturer, but that Sylmark informed Silicone Zone that the provision was unacceptable, and crossed it out before signing the agreement. (Complaint 11 38; complaint, exhibit 1, 1i 2.)
Paragraph 3 (c) prohibits Silicone Zone from using any “Sample Molds, Molds, Sample Products or any Company materials for the manufacture of any products or other materials for any person or company other than [Sylmark].” (Complaint, exhibit 1, 1i 3 [c].) Sylmark alleges that it provided Silicone Zone with design specifications for the molds, which were confidential information and its trade secrets. (Peter Spiegel affidavit, dated June 15, 2004, 1i 42.)
On July 22, 2003, the United States Patent and Trademark Office issued a design patent for its right-hand left-hand “Hot Holder” silicone gloves to Sylmark. (Peter Spiegel affidavit, dated June 23, 2004, 1Í 2, and exhibit A annexed thereto).* This design patent consists of six line drawings, without dimensions or design specifications. (Peter Spiegel affidavit, dated June 23, 2004, exhibit A.)
In November 2003, plaintiff Sylmark alleges that it discovered an advertisement placed by Silicone Zone for a product, under the name of “Two Hands,” which plaintiffs claim is virtually identical to its Hot Holder gloves. (Complaint 1i 45; complaint, exhibit 5.) The ad indicates that the gloves are silicone oven mitts, with a left- and right-hand design, and are safe at 675 degrees Fahrenheit. (Complaint, exhibit 5.) Plaintiffs claim that the pictures in the ad show that these mitts are virtually identical to plaintiffs’, that the ad wrongly states that Silicone Zone has a patent pending for them, and that it wrongly indicates that Silicone Zone owns the intellectual property for the gloves and may sell them. (Complaint H 46.) Plaintiffs also claim that they observed the “Two Hands” product at a trade show in March 2004, and that it was, indeed, a near replica of the Sylmark “Hot Holder” gloves. (Spiegel affidavit 1Í 45; see complaint, exhibit 7.)
By letter dated November 19, 2003, Sylmark’s counsel demanded that Silicone Zone cease and desist from manufacturing, advertising and selling the “Two Hands” silicone gloves, *290 which actions were in breach of the parties’ agreements. (Complaint, exhibit 6.) Thereafter, Sylmark made several demands for the return of the molds, sample molds and sample products, which demands Silicone Zone ignored. (Complaint lili 48-50.)
On March 6, 2004, Sylmark commenced a proceeding in the High Court of Hong Kong against Silicone Zone seeking an order requiring the return of the molds. (Id. 1i 51.) Sylmark’s application was granted, and Silicone Zone was ordered to deliver the molds to Sylmark’s counsel by March 17, 2004. (Complaint, exhibit 2.) In the March 6 order, Silicone Zone agreed not to damage, interfere with, use or remove from its possession, power or control, dispose of or otherwise deal with the molds for the silicone gloves made for Sylmark, and to refrain from advertising, selling, or offering for sale any items made, or to be made, from the molds. (Complaint, exhibit 2, at 1.) Plaintiffs allege that after it was ordered to produce the molds, Silicone Zone asserted that it did not have control over them, because it had provided them to a subcontractor in mainland China, the subcontractor was in bankruptcy proceedings, and Silicone Zone was unable to communicate with it or locate the molds. (Complaint 1i 54.)
On May 28, 2004, the High Court of Hong Kong imposed fees and costs on Silicone Zone for its failure to adequately explain the whereabouts of the molds (the order). (Spiegel affidavit, exhibit 3.) Upon the agreement of Silicone Zone, the Hong Kong court also incorporated in its order a restraint on Silicone Zone from “using ... or otherwise dealing with the ten sets of molds for silicone gloves made for plaintiff ... or any parts thereof except in compliance with the Order herein and from advertising, selling, offering for sale any items made or to be made from the Molds.” (Spiegel affidavit, exhibit 3, at 1.) Ho Wai Hong, Sylmark’s Hong Kong counsel, explains, in his affidavit in support of this application, that the Hong Kong order prohibits the marketing and sale of products made not only from the exact set of molds produced for Sylmark, but also from any set of molds that are nearly identical to those molds. (Ho Wai Hong affidavit, dated June 15, 2004, 1111 22, 23.) An evidentiary hearing in the Hong Kong proceedings was scheduled in July 2004 to determine if Silicone Zone is in contempt of the Hong Kong court’s order. (Spiegel affidavit 11 8.)
Plaintiffs allege that, despite the Hong Kong proceedings, Silicone Zone continues to market its “Two Hands” gloves, a knock-off of plaintiffs’ gloves, using Sylmark’s confidential *291 materials and its molds, or slightly modified versions of its molds. (Spiegel affidavit 1i 7.) They state that they recently located Silicone Zone’s factory in the Fuyong township, Shenzen, China, and discovered that Silicone Zone is still making the “Two Hands” gloves. (Ho Wai Hong affidavit 1Í 31.) The gloves were also still being offered for sale through the Silicone Zone, USA Web site as of the submission of plaintiffs’ papers. (Id.) They further assert that Silicone Zone’s refusal to return the molds to plaintiffs has delayed plaintiffs for several months from bringing their “Hot Holder” gloves to market, and, meanwhile, Silicone Zone has beat Sylmark to the market by offering for sale almost identical copies (with only minor alterations) of Sylmark’s own invention. (Spiegel affidavit 1i 8.)
The complaint alleges several causes of action. The first is against Silicone Zone for breach of the development, the confidentiality and the mold development agreements, based on defendants’ failure, inter alia, to return plaintiffs’ proprietary and confidential information and molds, and misappropriating and commercially exploiting such materials. The second and third (against all the defendants) are for unjust enrichment and conversion. The fourth (against all defendants except Silicone Zone) is for tortious interference with contract. The fifth (against all defendants) is for theft of trade secrets. The sixth is for violation of General Business Law §§ 349 and 350. The seventh seeks enforcement of the Hong Kong court’s order. Finally, the eighth is for unfair competition and misappropriation, against all defendants.
In this application, plaintiffs urge that they will succeed on the merits of their claims for breach of contract. They point to the various unambiguous provisions of the development and confidentiality agreements which acknowledged that the design for the “Hot Holder” gloves was Sylmark’s invention, and that design, and any information either imparted by Sylmark to defendants or which defendants developed in connection with these agreements, is confidential information and trade secrets belonging to plaintiffs. Thus, they urge that, under the agreements, Silicone Zone was obligated to maintain the confidentiality of the information, and not to use it for its own benefit. Plaintiffs further point to defendants’ failure to return the molds, and their actions in giving the molds to a subcontractor without plaintiffs’ consent as additional breaches of the agreements.
On their misappropriation of trade secrets claim, plaintiffs contend, again, that defendants acknowledged in the agree *292 ments that the information at issue is a trade secret, that plaintiffs invested time and effort to develop the information and maintain its secrecy, and that there are no other similar gloves on the market. (Spiegel affidavit, dated June 15, 2004, 1Í1Í14-21, 45-47; Spiegel affidavit, dated June 23, 2004, 1Í1Í 5-7.) They submit photos of both pairs of gloves as proof of the virtual identity of the defendants’ gloves with Sylmark’s “Hot Holder” gloves. (Spiegel affidavit, dated June 15, 2004, exhibit 9.) Plaintiffs assert that the existence of Silicone Zone’s knock-off gloves is proof of the misappropriation of plaintiffs’ trade secrets.
Plaintiffs further argue that they are also likely to succeed on the merits of the remaining claims for tortious interference, unjust enrichment, unfair competition, misappropriation of ideas and conversion.
As to irreparable harm, plaintiffs maintain that, because this is a motion to protect confidential information, irreparable harm is presumed. Nevertheless, they point to the fact that, if Silicone Zone had returned the molds when first requested, plaintiffs would have been able to produce and sell their “Hot Holder” gloves for several months already, and they would have developed goodwill and a market share in the silicone bakeware market. They also assert that, in the meantime, defendants have used the confidential information to make and sell the knock-off gloves, and take over the market. As to the balancing of the equities, plaintiffs assert that defendants will not be unfairly burdened by being required to abide by the parties’ agreements, and that equity does not favor an agent who breaches a duty of confidentiality owed to its principal.
Plaintiffs further contend that the Hong Kong court’s order should be enforced as a matter of comity, and that it is also enforceable as an ordinary contract.
In their opposition, defendants contend that this action should be asserted as a patent infringement suit, because plaintiffs own a patent for their silicone mitts. (See affirmation of Stephen E. Feldman, exhibit E.) Thus, they claim that this action should be dismissed because it must be brought exclusively in federal court.
Further, defendants urge that plaintiffs do not own any trade secrets in the area of silicone product manufacture, and that they cannot claim that their glove design is a trade secret since it was patented and, therefore, readily available from public sources. They also contend that they never breached any agree *293 ment or confidence. In support of these arguments, Silicone Zone submits the affidavits of two of its principals, defendants Ricky Yeung and Ken Yeung. Defendant Ricky Yeung asserts that Silicone Zone had designed molds for hundreds of products, including oven mitts and gloves, before it was contacted by Sylmark to make the “Hot Holder” gloves. (Ricky Yeung affidavit, dated June 25, 2004, 1i 4.) He states that Silicone Zone used its own confidential techniques and proprietary information to design the molds, but did not impart any of this confidential information to Sylmark. (Id. If 6.) He claims that Sylmark had no confidential information about designing and manufacturing silicone molds or silicone products, because Sylmark had informed Silicone Zone that it had never been in that business before. (Id. 1f 8.)
Ricky Yeung attests that the agreement between them required Sylmark to buy at least 100,000 pairs of gloves per month from Silicone Zone before it could take possession of the molds. (Id. If 9.) He admits that Sylmark struck out that provision, but states that Sylmark put its own and then a second set of initials by the deletion, and that Silicone Zone did not initial nor consent to the deletion. (Id. If 11.)
With respect to the whereabouts of the molds, Ricky Yeung states that Silicone Zone subcontracted the making of the molds to a factory in China, but that the subcontractor went bankrupt, and the owners of that company have disappeared with the molds. (Id. 1T12.) He claims that Silicone Zone’s failure to return the molds was not a breach because it made a good faith effort to locate and obtain them, but admits that the effort was unsuccessful.
Defendant Ken Yeung, in his opposition affidavit, attests that Silicone Zone had previously made a mold for silicone gloves and manufactured the gloves for TV Products (HK) Ltd. before it met Sylmark. (Ken Yeung affidavit 1Í 4; see also Ken Yeung affidavit, exhibit A.) The memorandum between TV Products and Silicone Zone indicates that Silicone Zone was to manufacture “Non-Food Grade Silicone” gloves. (Ken Yeung affidavit, exhibit A, at 1.) Ken Yeung also states that Sylmark’s drawings for its gloves had to be corrected by Silicone Zone based on its expertise in making molds for silicone gloves. (Ken Yeung affidavit 1f 5.) He states that Sylmark improperly deleted the clause requiring Sylmark to purchase 100,000 pairs of gloves from the mold development agreement. (Id. 1f 6.) He further states that Sylmark’s molds are not being used for Silicone Zone’s gloves, *294 because the gloves and molds are entirely different, and there is no practical way to redo a set of molds once they are made. {Id. 1Í 7.) Based on these submissions, defendants contend that plaintiffs have no claim for misappropriation of trade secrets.
Defendants also argue that this action should be dismissed because of the pendency of the Hong Kong proceedings, which they claim will provide plaintiffs with adequate relief. They claim that they have complied with the Hong Kong court’s order, since they have not advertised, sold or offered for sale any items made, or to be made, from plaintiffs’ molds. They assert that they are only selling gloves made from their own molds. To the extent that plaintiffs are seeking an injunction stopping them from marketing any gloves produced from plaintiffs’ proprietary information, defendants contend that this would be well beyond the scope of the Hong Kong court’s order.
As to irreparable harm, defendants urge that there are no protectable trade secrets, and that plaintiffs have an adequate remedy in damages. They state that plaintiffs’ 10 molds are not being used to produce any products, and plaintiffs have instructed another manufacturer to make another set of molds. They claim that the equities balance in their favor because they did not misappropriate any trade secrets, that they will lose sales and profit during the action, and that the damages may be calculated.
Discussion
Plaintiffs’ application for a preliminary injunction is granted. Subject Matter Jurisdiction
As a threshold issue, defendants’ contention that this court lacks subject matter jurisdiction because this action is really one for patent infringement is rejected. This is not a patent infringement action by a patent holder against a competitor. Rather, it is an action for, inter alia, breach of contract and misappropriation of trade secrets and confidential information by an inventor against the company it hired to manufacture its invention. While federal courts have exclusive jurisdiction over cases arising under patent law, “actions involving contracts relating to patents . . . are not considered suits arising under those laws, and are properly brought in the State court, even if the validity of the patent may somehow be involved and the plaintiff could have brought suit for its infringement in the Federal court.” (American Harley Corp. v Irvin Indus., 27 NY2d 168, 172 [1970], cert denied 401 US 976 [1971]; see Aronson v *295 Quick Point Pencil Co., 440 US 257 [1979].) This court has subject matter jurisdiction over the claims asserted here.
Preliminary Injunction Standards
A preliminary injunction may be granted upon a showing of (1) the likelihood of success on the merits, (2) irreparable injury absent the granting of preliminary injunctive relief, and (3) a balancing of the equities. (Aetna Ins. Co. v Capasso, 75 NY2d 860, 862 [1990]; Grant Co. v Srogi, 52 NY2d 496, 517 [1981].) The existence of a factual issue on a motion for a preliminary injunction is not, standing alone, a sufficient basis for its denial. (CPLR 6312 [c].)
Plaintiffs have asserted a number of causes of action against the defendants. In urging that they will succeed on their claims, plaintiffs lead with the breach of contract and misappropriation of trade secrets claims, and also briefly argue with respect to the remaining claims. As determined below, plaintiffs have demonstrated that they will likely succeed on their breach of contract and the misappropriation of trade secrets claims, and, therefore, it is not necessary to consider the remaining claims on this motion.
Breach of Contract
To establish a breach of contract claim, the plaintiffs must allege the specific terms of the agreement, the consideration, the plaintiffs’ performance, and the defendants’ breach of the agreement. (Furia v Furia, 116 AD2d 694, 695 [2d Dept 1986].) A contract to retain the confidentiality of certain matters which should be kept in confidence will be enforced by injunction. (See Karpinski v Ingrasci, 28 NY2d 45 [1971]; Doe v Roe, 93 Misc 2d 201, 210-211 [Sup Ct, NY County 1977].)
Plaintiffs present undisputed evidence of the three, unambiguous agreements — the development agreement, the confidentiality agreement and the mold development agreement — in which Silicone Zone specifically acknowledged that the design for Sylmark’s “Hot Holder” oven mitts is Sylmark’s invention and “shall remain solely the exclusive property of Sylmark” (complaint, exhibit 3, confidentiality agreement 1ÍH 2, 13), and that the design and the information imparted to Silicone Zone, such as business information, design and manufacture specifications relating to the manufacture of that invention, or developed by Silicone Zone in connection with the agreements, is confidential information belonging to Sylmark. (Complaint, exhibit 4, development agreement HH 4.a, 6; complaint, exhibit 1, mold development agreement HI [c], [d].) These agreements required *296 Silicone Zone to keep this information confidential, and, impliedly, not to use it for its own benefit or at Sylmark’s expense.
Plaintiffs present proof that they performed their obligations under these agreements by providing defendants with their design specifications and drawings, sizing information, information on how to ensure the gloves were heat resistant, analyses about how to design around a competitor’s patent so as not to infringe on it, their sales projections, marketing plans and channels of distribution, all confidential materials under the agreements. They also present proof, undisputed by defendants, that they paid the contract price for the molds.
With respect to defendants’ breach, there is substantial evidence in the record that defendants breached these confidentiality provisions in designing, manufacturing and selling silicone oven mitts with not only the same properties, such as heat resistance, left-hand and right-hand design, and dexterity, but which are nearly identical in appearance to Sylmark’s “Hot Holder” gloves. (See Spiegel affidavit, dated June 15, 2004, exhibit 9 [photos comparing the “Hot Holder” gloves and Silicone Zone’s “Two Hands” gloves].) Silicone Zone’s oven mitts have been marketed on its own Web site as well as through Web sites of various retailers. (Spiegel affidavit, June 15, 2004, 111! 44-46, 60, and exhibit 5 annexed thereto.) Peter Spiegel, Sylmark’s director, attested that the striking similarity of the gloves, as well as Sylmark’s conversations with Silicone Zone personnel, in which they demonstrated that they had no knowledge of a design such as Sylmark’s prior to the parties’ agreements, demonstrates that Silicone Zone was relying on the confidential information which Sylmark had provided to it under the agreements. (Spiegel affidavit, June 15, 2004, 1! 45.) Spiegel further attested that, without Sylmark’s legal opinions and analyses, Silicone Zone would not have known how to design around a competitor’s patent, which covered an ambidextrous silicone glove under the brand name “Orka,” and which Silicone Zone initially believed prevented anyone else from legally selling silicone gloves in the United States. (Spiegel affidavit, dated June 23, 2004, 1! 5 [a].) The simple fact that Silicone Zone was able to bring a nearly identical set of gloves to market so quickly, while retaining Sylmark’s molds and refusing to return them, further points to the likelihood that defendants used plaintiffs’ confidential information in violation of the parties’ agreements.
Defendants’ bare assertion that the gloves “are entirely different” (Ken Yeung affidavit If 7) fails to sufficiently dispute *297 plaintiffs’ proof. Moreover, their claim that they had previously manufactured gloves for TV Products also is insufficient because it fails to show that the gloves were of the same design, and that the “Non-Food Grade” silicone was the same. In any event, even where there is a factual dispute, a plaintiff may still demonstrate a likelihood of success, particularly where the plaintiff seeks, as Sylmark does here, to maintain the status quo. (See Sau Thi Ma v Xuen T. Lien, 198 AD2d 186 [1st Dept 1993], lv dismissed 83 NY2d 847 [1994].) The issuance of Sylmark’s design patent, in July 2003, does not vitiate Silicone Zone’s obligations under the agreements, particularly since there is some proof that defendants were designing and manufacturing their gloves before the patent was issued. (Spiegel affidavit, dated June 23, 2004, 1Í 4.)
Further, Silicone Zone also breached the provisions of the development and mold development agreements which specifically required the return of the molds, sample molds and sample products upon Sylmark’s request. This defendants have failed to do, as evidenced by the Hong Kong proceedings and order. Defendants’ defense, that they made a good faith effort to obtain the molds from the subcontractor, not only is insufficient but demonstrates that they also breached the provisions of the parties’ agreements requiring that they obtain Sylmark’s consent before they use, encumber or disclose to a third party any of Sylmark’s company materials, including, most importantly, the molds. (Complaint, exhibit 1, 1Í 1 [d].) Accordingly, plaintiffs have demonstrated a likelihood of success on their breach of contract claims.
Misappropriation of Trade Secrets
Plaintiffs have also demonstrated a likelihood of success on their claim for misappropriation of trade secrets. To establish a claim for misappropriation of trade secrets, plaintiff must show (1) that it possesses a trade secret, and (2) that defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. (Double-Click, Inc. v Henderson, 1997 WL 731413, *3, 1997 NY Misc LEXIS 577, *7 [Sup Ct, NY County, Nov. 5, 1997].) New York courts have adopted the trade secret definition set forth in Restatement (First) of Torts § 757, Comment b, as “any formula, pattern, device or compilation of information which is used in one’s business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.” (Id.; see Ashland Mgt. v Janien, 82 NY2d 395, 407 [1993]; U.S. Reins. Corp. v Humphreys, 205 AD2d 187, 191 [1st Dept 1994].)
*298 The factors considered in evaluating claims of trade secrecy include:
“(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.” (Restatement [First] of Torts § 757, Comment b.)
In this case, it is important to note that Silicone Zone acknowledged in its agreements with Sylmark that the various confidential materials and information Sylmark was providing to it were secret, and that Silicone was obligated to maintain such confidentiality. Plaintiffs present proof that the design for Sylmark’s “Hot Holder” gloves; the specifications and drawings; the information on how to best design the product, what size worked best, and how to ensure that the gloves were sufficiently heat resistant; and the design of the molds were not known outside a select few Sylmark employees. (Spiegel affidavit, dated June 15, 2004, 1111 14-21; see also Spiegel affidavit, dated June 23, 2004, 11 5 [d].)
Silicone Zone was obligated under the agreements to guard the secrecy of this information; Sylmark dealt with only a few of Silicone Zone’s employees. (Spiegel affidavit, dated June 15, 2004, 1Í19; Spiegel affidavit, dated June 23, 2004, 1Í 5 [d].) Sylmark presents proof that it invested a great deal of time and effort to develop the information, including time spent analyzing how to design around a competitor’s patent, developing marketing plans and sales projections. (Spiegel affidavit, dated June 23, 2004, H 5.) Sylmark sought and obtained a patent because the design was not generally known in the business. Defendants’ assertion that the information was not secret because the patent was in the public domain is not borne out by the record. The patent consists solely of six line drawings; it does not contain the precise dimensions, specifications, or other proprietary information with respect to the actual final design and manufacture of the gloves, as well as the marketing plans, sales projections, and legal analyses that were specified in Sylmark’s papers as trade secrets. Accordingly, Sylmark has demonstrated *299 that it possessed trade secrets with respect to the “Hot Holder” gloves, which it shared with defendants in anticipation of defendants’ role in manufacturing molds for the gloves, and which trade secrets defendants specifically acknowledged in their agreements with plaintiffs.
There is substantial evidence in the record that defendants misappropriated Sylmark’s trade secret information in violation of their agreements with Sylmark. As discussed above, the photos of Silicone Zone’s “Two Hands” gloves show that they are nearly identical to the “Hot Holder” gloves, and may be held to be significant proof of misappropriation. Again, the development and sale of the “Two Hands” gloves before Sylmark’s patent was issued, and while defendants were purportedly working on Sylmark’s gloves, similarly point to defendants having likely misappropriated plaintiffs’ trade secrets. Therefore, plaintiffs have shown a likelihood of prevailing on their claim of misappropriation of trade secrets.
Irreparable Injury
Plaintiffs have established irreparable injury. “Irreparable harm is presumed, where, as here, trade secrets have been misappropriated.” (Doubleclick, Inc. v Henderson, 1997 WL 731413, *7, 1997 NY Misc LEXIS 577, *20, supra; see Lumex, Inc. v Highsmith, 919 F Supp 624, 628 [ED NY 1996].) The loss of an industry leader’s market, and the loss of the advantage of being a pioneer and a market leader, may constitute irreparable harm. (Lumex, Inc. v Highsmith, supra.) Even without this presumption, plaintiffs have shown that without the injunction they will continue to suffer irreparable harm. While defendants have been refusing to return plaintiffs’ molds, defendants have been selling their own gloves, and preventing plaintiffs from entering the market. Plaintiffs have demonstrated that they are suffering a loss of goodwill, sales, and market share every day that defendants are able to sell gloves, which are apparently derived from plaintiffs’ trade secrets. The damage that is being inflicted upon Sylmark by defendants’ exploitation of plaintiffs’ proprietary information regarding the oven mitts is impossible to quantify in dollars. Therefore, an injunction is appropriate. (See Adirondack Appliance Repair v Adirondack Appliance Parts, 148 AD2d 796 [3d Dept 1989]; see also Doubleclick, Inc. v Henderson, 1997 WL 731413, *7, 1997 NY Misc LEXIS 577, *20, supra.)
Balance of the Equities
Plaintiffs have demonstrated that the balance of equities tips heavily in their favor. The preliminary injunction plaintiffs seek *300 will maintain the status quo — defendants will be enjoined from using Sylmark’s confidential and proprietary information and from producing the gloves that appear to be knock-offs of plaintiffs’ invention pending disposition of this case. (See Garvin GuyButler Corp. v Cowen & Co., 155 Misc 2d 39 [Sup Ct, NY County 1992].) Defendants make no allegations that plaintiffs have acted tortiously against them or otherwise have unclean hands. In contrast, as plaintiffs point out, equity does not favor an agent which breaches the duty of confidentiality owed to its principal. (See DoubleClick, Inc. v Henderson, 1997 WL 731413, *7,1997 NY Misc LEXIS 577, *20, supra.) In view of defendants’ admitted breach of the development and confidentiality agreements in delivering the molds to a third party without consent and in refusing to return the molds, and in their apparent breach in producing nearly identical gloves, the equities do not tip in their favor.
Hong Kong Court’s Order
With respect to the Hong Kong court’s order, since this court is granting the injunction requested by plaintiffs, the Hong Kong court’s order will, in effect, be enforced. That order, to which defendants consented, precludes them from using, transferring or otherwise dealing with the 10 sets of molds for silicone gloves, or any parts thereof, made for Sylmark, and from advertising, selling, or offering for sale any items made or to be made from the molds. (Spiegel affidavit, dated June 15, 2004, exhibit 3, at 1.) These actions will be enjoined by this court’s injunction. Defendants’ contention that this action should be dismissed because of the pendency of the Hong Kong proceeding is rejected. As the defendants themselves concede, the injunction requested here would be beyond the scope of the Hong Kong proceeding. In the Hong Kong proceeding, Sylmark is seeking the return of the molds and anything made from the molds. In contrast, this action is much broader, addressing the breaches of the agreements between the parties, as well as other alleged torts relating to defendants’ actions. As discussed above, this court has subject matter jurisdiction over these claims, and they are properly brought here.
Attachment
Plaintiffs’ request for an attachment is denied. Prejudgment attachment is a provisional remedy to secure a debt by preliminary levy upon the property of the debtor in order to conserve that property for eventual execution. (See Michaels Elec. Supply Corp. v Trott Elec., 231 AD2d 695 [2d Dept 1996].) Because at *301 tachment is a harsh remedy, the statute must be strictly construed in favor of those against whom it may be applied. (Id.; Wanderer Assoc. v Talcott Communications Corp., 111 AD2d 55 [1st Dept 1985].) Indeed, the granting of prejudgment attachments is discretionary, “ ‘and even when the statutory requisites are met, the order may be denied.’ ” (Elliott Assoc., L.P. v Republic of Peru, 948 F Supp 1203, 1211 [SD NY 1996], quoting Filmtrucks, Inc. v Earls, 635 F Supp 1158, 1162 [SD NY 1986].)
Pursuant to CPLR 6201 (1), a court may order an attachment when “the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state.” (CPLR 6201 [1].) This provision serves two independent purposes: (1) obtaining jurisdiction over a nonresident, and (2) providing adequate security for a potential judgment against a nonresident where there is an identifiable risk that the defendant will not be able to satisfy any such judgment. (Elton Leather Corp. v First Gen. Resources Co., 138 AD2d 132 [1st Dept 1988]; Cargill, Inc. v Sabine Trading & Shipping Co., Inc., 756 F2d 224 [2d Cir 1985]; see also General Textile Print. & Processing Corp. v Expromtorg Intl. Corp., 862 F Supp 1070, 1073 [SD NY 1994] [plaintiffs must show that defendants’ financial position, or past or present conduct, poses a real risk to the enforcement of a future judgment].)
Here, while defendants Ricky and Ken Yeung are nondomiciliaries residing outside the state, and Silicone Zone International Limited is a Hong Kong entity not qualified to do business here, jurisdiction has been obtained over these parties. Thus, the first purpose of attachment has already been satisfied. With respect to the second purpose, plaintiffs have failed to demonstrate a real identifiable risk that the defendants will be unable to satisfy any judgment obtained by plaintiffs. They fail to present evidence that these defendants would conceal or convert any of their assets were it not for an attachment order, or that they would be unlikely to satisfy the potential judgment.
Plaintiffs also seek an attachment under CPLR 6201 (3). Under this provision, the plaintiff must demonstrate that: (1) the defendant has assigned, disposed of, encumbered or secreted its property or removed it from the state, or is about to do any of these acts, and (2) the defendant has acted or will act with the intent to defraud its creditors or to frustrate the enforcement of a judgment that might be rendered in plaintiffs favor. (CPLR 6201 [3]; Societe Generale Alsacienne De Banque, Zurich *302 v Flemingdon Dev. Corp., 118 AD2d 769 [2d Dept 1986].) “Fraud is not lightly inferred, and the moving papers must contain evidentiary facts — as opposed to conclusions — proving the fraud.” (McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C6201:4; see also Anderson v Malley, 191 App Div 573 [1st Dept 1920].) Affidavits containing allegations raising a mere suspicion of an intent to defraud are insufficient. (Rosenthal v Rochester Button Co., 148 AD2d 375 [1st Dept 1989].) It must appear that such fraudulent intent really exists in the defendant’s mind. (Eaton Factors Co. v Double Eagle Corp., 17 AD2d 135 [1st Dept 1962]; accord Computer Strategies v Commodore Bus. Machs., 105 AD2d 167 [2d Dept 1984], lv denied 110 AD2d 743 [2d Dept 1985].) The mere removal or assignment or other disposition of property is not grounds for an attachment. (See Computer Strategies v Commodore Bus. Machs., supra.)
Plaintiffs rely on the fact that Silicone Zone removed the molds to China, allegedly to frustrate the Hong Kong court’s order, as their basis for seeking attachment under this section of the statute. This is insufficient. Evidence of the mere removal of property is not enough. The remainder of their argument is based on their contention that there is “every reason to believe” that defendants will send all assets overseas. Such vague and conclusory allegations, without evidentiary facts indicating a fraudulent concealment of assets, are insufficient for a prejudgment attachment. (See Wanderer Assoc. v Talcott Communications Corp., supra.) They fail to present any evidentiary facts which would indicate a fraudulent concealment of assets. Therefore, this branch of their application is denied.
Expedited Discovery
Plaintiffs’ request for expedited discovery and the reversal of normal priority in discovery to explore defendants’ misfeasance and prevent any further dissemination of trade secrets is granted. Expedited discovery and the reversal of priority are warranted in light of defendants’ unique possession of the information necessary to determine the extent of their unlawful conduct. (See Bel Geddes v Zeiderman, 228 AD2d 393 [1st Dept 1996] [plaintiff granted priority for breach of fiduciary duty claim because, if true, details would be known only to defendant]; see also DoubleClick, Inc. v Henderson, 1997 WL 731413, 1997 NY Misc LEXIS 577, supra [court ordered expedited discovery in misappropriation of trade secrets case].)
The court has considered defendants’ remaining arguments, and finds them to be without merit.
*303 Accordingly, due deliberation having been had, and it appearing to this court that a cause of action exists in favor of plaintiffs and against defendants, and that plaintiffs are entitled to a preliminary injunction on the ground that defendants threaten or are about to do, or are doing, or procuring or suffering to be done, an act in violation of plaintiffs’ rights respecting the subject of the action and tending to render the judgment ineffectual, as set forth in the above decision, and the plaintiffs have demanded and would be entitled to a judgment restraining the defendants from the commission or continuance of an act, which, if committed or continued during the pendency of the action, would produce injury to the plaintiffs, as set forth in the above decision, it is ordered that the undertaking is fixed in the sum of $100,000, conditioned that the plaintiffs, if it is finally determined that they were not entitled to an injunction, will pay to the defendants all damages and costs which may be sustained by reason of this injunction; and it is further ordered that defendants, and all persons acting in concert with them, or subject to their supervision and control, are enjoined and restrained, during the pendency of this action, from doing or suffering to be done, directly or through any attorney, agent, servant, employee or other person under the supervision or control of defendants, any of the following acts: using, exploiting, transferring, marketing, manufacturing, selling, distributing, or taking any action with respect to certain molds, sample molds and products (a) for the “Hot Holder” oven mitts, and that were otherwise made in connection with certain agreements between the parties relating to the development of the oven mitts, and (b) for the Silicone Zone “Two Hands” left- and right-handed silicone oven mitts, or any other products, designs or ideas produced, developed or derived from the trade secrets and/or confidential proprietary information that plaintiffs provided to defendants, or which were developed by defendants for plaintiffs pursuant to the agreements between the parties, including the molds, sample molds obtained from or produced for plaintiffs, sample products, information, specifications, designs, drawings, models, research and development materials.

 Additional papers were submitted by the parties, in response to the court’s request, after the motion was fully submitted. The affidavits and exhibits will be referred to in this decision. The court notes that the defendants’ submission did not address the issue that they were directed to address.