# NAP IV LLC v Qube USA LLC

2024 NY Slip Op 31892(U)

May 31, 2024

Supreme Court, New York County

Docket Number: Index No. 651937/2024

Judge: Margaret A. Chan

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART 49M

-------------------------------------------------------------------------X

NAP IV LLC D/B/A STS MCM,

                                Plaintiff,

               - v -

QUBE USA LLC, GEORGE VLAMIS, and QUINE LIDDELL

                            Defendants.

-------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 651937/2024 |
| **MOTION DATE** | 04/12/2024 |
| **MOTION SEQ. NO.** | MS 001 |

**DECISION + ORDER ON MOTION**

HON. MARGARET A. CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 001) 2, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41

were read on this motion to/for         PREL INJUNCTION/TEMP REST ORDR

      In this case over the fate of a licensed cannabis dispensary opening in June 2024 in Times Square, plaintiff NAP IV LLC, doing business as STS MCM ("plaintiff" or "NAP IV"), moves for a preliminary injunction prohibiting defendants George Vlamis, Quine Liddell (together with Vlamis "the Individual Defendants"), and Qube USA LLC ("Qube," and together with the Individual Defendants, "defendants") from opening the dispensary. Defendants oppose the motion. For the reasons below, the motion is denied.

## Background

      Plaintiff is a company whose "primary business involves operating, financing, and raising capital for businesses" (NYSCEF # 39, Reply, ¶ 14). Plaintiff's managing member is Vadim Michael Korytny (NYSCEF # 5, Korytny Aff, ¶ 1; NYSCEF # 7, Overview of Location, at 1).

      Defendant Qube is a business entity that has a "license[] to operate an adult-use cannabis dispensary" through the Office of Cannabis Management's (OCM) Conditional Adult Use Retail Dispensary (CAURD) program (*see* NYSCEF # 26, Vlamis Aff, at ¶¶ 10-12; *see also* NYSCEF # 31, Qube's CAURD License). Individual Defendants Vlamis and Liddell are the members of Qube (NYSCEF # 1, Compl., at ¶¶ 9-10), and controlled its actions at all relevant times. Vlamis and Liddell both qualify as "justice involved individuals," meaning that under OCM regulations they "ha[ve] been unjustly affected by a history of unjust criminal drug laws" and therefore qualified to apply for the license to operate a cannabis dispensary under the CAURD program (NYSCEF # 26 ¶¶ 10-11).

[* 1]

At the center of this controversy is a storefront located at 1412 Broadway, New York, NY ("the Location"), which sits at the bottom tip of Times Square (NYSCEF # 1 ¶ 1). The landlords of the Location are Chetrit 1412 LLC, 1412 BH DE LLC, and 1412-1416 RSVP DE LLC (together "Landlords") (*see* NYSCEF # 9, Letter from Landlord to OCM; NYSCEF # 13, Signed August Conditional Lease, at *2). The existing tenant during most of the relevant events was the ticketing company StubHub (*see* NYSCEF # 1 ¶ 19). Neither the Landlord nor StubHub are parties to this case.

In early 2023, plaintiff was searching for both a location in Times Square to open a licensed cannabis dispensary and a partner who could apply for a license under the CAURD program (*see id.* ¶ 11; NYSCEF # 39 ¶ 15). Plaintiff found the former in March 2023 when it was informed that the Landlord of the Location was willing to rent to people in the newly-legalized cannabis industry (NYSCEF # 1 ¶ 11). Plaintiff was given this information by a landlord representative named Charles Aini, who also allegedly told plaintiff that the Location was not publicly listed for rent (*id.*).[1]

Plaintiff then turned its attention to finding a CAURD license-holder with whom it could partner to open a dispensary at the Location. Plaintiff's first potential partner was non-party Royal Leaf NY, LLC (Royal Leaf), whose principal quickly emailed OCM and received "site lock" protection over the Location (NYSCEF # 1 ¶ 12).[2] However, Royal Leaf eventually pulled out because it was more interested in running a delivery hub than a retail dispensary (*id.* ¶¶ 12, 21).

Plaintiff later found defendants, who had recently received "provisional approval" for a CAURD license and needed to secure a location to perfect that license (*id.* ¶ 14; NYSCEF # 26 ¶¶ 12-14). The parties disagree on what was discussed in the initial meeting. Plaintiff alleges that defendants claimed they only needed a location, and that they already "had access to the necessary funding" to build a dispensary "with minimal effort from [plaintiff]" (NYSCEF # 1 ¶ 15). Defendants, by contrast, claim that they needed both a location and funding, and that plaintiff promised it could deliver both a "viable lease" and "$500,000 for [Qube's] buildout and operational costs" (NYSCEF # 26 ¶ 18).

In either case, plaintiff refused to tell defendants the address of the Location or the identity of the Landlord unless defendants agreed to sign a non-disclosure

---

[1] Aini's assertion that the availability of Location was not public is contradicted by a "Retail Space for Lease" sign in the door as recently as July 14, 2023 (*see* NYSCEF # 33, Picture and Text to Korytny), and defendants asserted at oral argument that the same or similar sign can be seen on Google Maps Street View as early as 2022. Regardless, plaintiff relied on Aini's representation that the Location was not publicly listed.

[2] Plaintiff alleges that OCM "site lock" protection means that no other retail cannabis operator can open or be within a 1000-foot radius of the protected location (*id.*).

651937/2024  NAP IV LLC, D/B/A STS MCM vs. QUBE USA LLC ET AL
Motion No.  001

Page 2 of 11

2 of 11

[* 2]

agreement ("the NDA"), which defendants did on June 1, 2023 (NYSCEF # 1 ¶ 16). Pursuant to the NDA, plaintiff would provide defendants confidential information about a "business opportunity . . . at a location in Times Square" ("the Opportunity") (NYSCEF # 6, NDA, at First Whereas Clause). The NDA does not give further details about what the Opportunity entails, and the parties disagree on its scope: plaintiff argues "the Opportunity" refers to the chance to rent at the Location generally, while defendants claimed at oral argument that "the Opportunity" refers to an opportunity to rent at the Location *from StubHub* (the current tenant).

Either way, in exchange for the Opportunity, the NDA provided that defendants agreed to a "non-circumvention" clause, pursuant to which defendants would not "directly or indirectly participate in any discussion or negotiation or enter into or participate in any agreement or transaction with respect to the Opportunity" without plaintiff's involvement unless plaintiff gave "prior written consent," until November 30, 2026 (NYSCEF # 6 ¶ 6; NYSCEF # 1 ¶ 17 [calculating date non-circumvent ends]). The parties further agreed that because any breach of the contract "may cause [plaintiff] to suffer loss that cannot be adequately compensated for by monetary damages alone," plaintiff is entitled to "seek an injunction or other equitable relief to specifically enforce the terms of this NDA" (NYSCEF # 6 ¶ 13).

Separately, the parties also entered an agreement in which defendants would grant plaintiff 49% equity in Qube *if* plaintiff could deliver a location and at least $500,000 in funding for build-out of the space (NYSCEF # 1 ¶¶ 15, 34). While this deal started as an oral agreement, Qube later memorialized it in a corporate resolution dated August 4, 2023 ("the Corporate Resolution" or "Resolution") (NYSCEF #s 14 & 28, Corporate Resolution).[3] The Resolution states that plaintiff will receive 4,900,000 Class A shares in Qube "subject to [plaintiff's] provision of the Offer" (*id.* at First "Resolved" paragraph). "The Offer" is defined in the Resolution as an offer of "both a viable lease and funding of at least $500,000 for the Company's build-out and operations" (*id.* at Fourth Whereas paragraph).

The parties disagree on what happened next. In plaintiff's telling, they overcame multiple obstacles in a concerted effort to bring defendants a workable deal. Plaintiff first convinced Royal Leaf to contact OCM and remove the site lock protection, "thus clearing the way for [plaintiff] to get a substituted proximity lock for Qube" (*id.* ¶ 21). Plaintiff then tried negotiating a sublease from StubHub, which StubHub ultimately rejected due to concerns that cannabis is still illegal at the federal level (*id.* ¶¶ 22-27). Plaintiff was directed to continue negotiations through StubHub's broker, whom plaintiff then learned had been trying to rent the Location to non-cannabis tenants (*id.* ¶ 27). Plaintiff managed to negotiate a deal in which StubHub would pay Landlord to be let out of the lease early (*id.* ¶ 28). Plaintiff then

---

[3] The Corporate Resolution is dated August 4, 202**2**, but this is clearly a typo given (a) the parties agree they first met in 2023 and (b) the body and signature dates in the Resolution refer to August 202**3**.

[* 3]

turned its efforts towards a deal between Landlord and defendants, resulting in a conditional lease proposed in August 2023 ("August Conditional Lease") (*id.* ¶ 29). This lease would only take effect if defendants paid Landlord a $1.25 million security deposit to get the Location and $650,000 towards the buildout (*id.* ¶ 28; NYSCEF # 37, August Conditional Lease, at *73, *101). Defendants allegedly wanted this deal so much that they rushed to sign it, issued the earlier-mentioned Corporate Resolution to give plaintiff the promised 49% equity, and relied on the Resolution in an application for relief from a state-wide preliminary injunction against New York's cannabis laws in *Fiore v New York State Office of Cannabis Management*, Index No. 907282-23 (NYSCEF # 1 ¶¶ 32-34; NYSCEF #s 14 & 28; NYSCEF # 15, Liddell aff in *Fiore*, ¶ 5).

From defendants' perspective, however, plaintiff "repeated[ly] fail[ed] to deliver capital or a viable lease" (*see* NYSCEF # 26 ¶ 47). Plaintiff first swore defendants to secrecy because the Location was not publicly listed for rent—a claim that proved to be untrue when defendants saw the "Retail Space for Lease" sign on the door in July 2023 (*id.* ¶¶ 63–69; NYSCEF # 33). Plaintiff also promised a favorable set of terms with StubHub that never came to fruition because of StubHub's refusal to sublet to cannabis companies (NYSCEF # 26 ¶¶ 26-27). Defendants then allege that they, not plaintiff, negotiated the August Conditional Lease with Landlords (*id.* ¶ 27). Defendants did not have $1.25 million for the security deposit but signed anyway because (a) defendants needed to "show the OCM that [they] were attempting to secure site control," and (b) plaintiff promised it could raise that amount from investors (*id.* ¶¶ 29-33). Defendants allege that plaintiff never followed through on this promise, so the August Conditional Lease never became binding (*id.* ¶¶ 30-34). Plaintiff, for its part, tacitly concedes that it did not pay or offer to pay the deposit until months later (*see* NYSCEF # 1 ¶ 36 [plaintiff offered to cover security deposit after finding out about a new lease]; NYSCEF # 16, Proposed December 2023 Lease ["new lease" the plaintiff learned about was from December 2023]).

There is no dispute that sometime after the August Conditional Lease, defendants began directly negotiating with the Landlord for a new lease (*id.* ¶ 40; NYSCEF # 1 ¶ 35).[4] Plaintiff learned of these negotiations sometime in December 2023 (*see* NYSCEF # 1 ¶ 35; NYSCEF # 16, Proposed December 2023 Lease). Plaintiff tried to work things out with defendants, advising them that "it had access to more than enough funds to cover the [August Conditional Lease's] security deposit as well as the buildout and would deposit such funds upon execution of a mutually agreeable updated amended operating agreement" (NYSCEF # 1 ¶ 36). Defendants, however, assert that plaintiff's "mutually agreeable operating agreement" would increase plaintiff's equity from 49% to 70%, distributed between plaintiff and an investor group (NYSCEF # 26 ¶ 82). Defendants provide an email

---

[4] Defendants allege, without evidence, that the Landlord refused to involve plaintiff in negotiations, calling any involvement from plaintiff a "dealbreaker" (NYSCEF # 26 ¶¶ 41-42).

651937/2024   NAP IV LLC, D/B/A STS MCM vs. QUBE USA LLC ET AL
Motion No. 001

Page 4 of 11

4 of 11

from plaintiff that purportedly lays out this deal (NYSCEF # 34, Korytny Dec. 12, 2023 Email). However, the email is anything but clear: it says that defendants will receive a combined 30% of the company, but that the operating agreement will continue to list them as owning 51% for the time being (*id.*). The remaining 49% of Qube would be split between plaintiff and the investor group (*id.*), which leaves 21% of the company unaccounted for. Defendants essentially claim that this 21% would actually be owned by plaintiff and the investors.

Defendants allege that they informed plaintiff this structure would be illegal (NYSCEF # 26 ¶ 82). Defendants further allege that plaintiff responded by offering a $50,000 bribe "to improve our position" in a text; defendants rejected the offer (*id.*). Defendants offer a text message that allegedly shows this bribe (NYSCEF # 35, Korytny Dec. 11, 2023 Text). It is unclear who "our" is in the text or what "improve our position" means.

In any event, defendants rejected all of plaintiff's offers and continued negotiating directly with the Landlord. Defendants also found a new partner with which to open the dispensary (*see* NYSCEF # 1 ¶¶ 37-38; NYSCEF # 18, Memo of Understanding Between Qube and New Partner).

In February 2024, defendants and the Landlord finally signed a new lease for the Location with no input from plaintiff ("February Lease") (NYSCEF # 26 ¶ 44; NYSCEF # 30, February Lease). Defendants agreed to pay a $420,000 security deposit and $70,000 in rent per month (NYSCEF # 30, February 2024 Lease, at §§ 2[A][i], 49 [A]). The Individual Defendants also personally guaranteed certain amounts under the February Lease, which they claim total about $1.26 million in rent (NYSCEF # 26 ¶ 49).

Two months later, on April 12, defendants received their full official license from OCM and took possession of the Location (NYSCEF # 26 ¶ 48; NYSCEF # 31). The same day, plaintiff filed this case and the present temporary restraining order and preliminary injunction motion (*see* NYSCEF # 1; NYSCEF # 2, Proposed Order to Show Cause).

Plaintiff pleads two causes of action: breach of the NDA's non-circumvention clause; and breach of fiduciary duty owed under the NDA (NYSCEF # 1 ¶¶ 39-52). As a remedy for the breach of NDA claim, plaintiff requests that defendants be "permanently enjoined from opening a dispensary at the Location until such time as Qube issues [plaintiff] 49% equity" (*id.* ¶ 44). The fiduciary duty claim seeks $500,000 in damages (*id.* ¶ 52). As for the preliminary injunction, plaintiff requests defendants be enjoined from opening their business pending the resolution of this case. Defendants oppose the motion.

**651937/2024  NAP IV LLC, D/B/A STS MCM vs. QUBE USA LLC ET AL**
**Motion No.  001**

Page 5 of 11

5 of 11

## Legal Standard

A preliminary injunction is a drastic remedy, which should not be granted unless the movant demonstrates a "clear right" to such relief (*City of New York v 330 Continental, LLC*, 60 AD3d 226, 234 [1st Dept 2009]). To be entitled to a preliminary injunction, a party must establish three elements: (1) a likelihood of success on the merits, (2) irreparable injury if the preliminary injunction is withheld, and (3) a balance of equities tipping in favor of the moving party (*1234 Broadway LLC v West Side SRO Law Project*, 86 AD3d 18, 23 [1st Dept 2011], citing Doe v Axelrod, 73 NY2d 748 [1988]). If any one of these three requirements is not satisfied, the motion must be denied (*Faberge Intern., Inc. v Di Pino*, 109 AD2d 235 [1st Dept 1985]). Moreover, "[p]roof establishing these [requirements] must be by affidavit and other competent proof with evidentiary detail" (*Scotto v Mei*, 219 AD2d 181, 182 [1st Dept 1996]). Whether to grant a preliminary injunction is "committed to the sound discretion of the motion court" (*Harris v Patients Med., P.C.*, 169 AD3d 433, 434 [1st Dept 2019]).

## Discussion

Plaintiff moves for a preliminary injunction to enjoin defendants from opening their dispensary until the conclusion of this case (NYSCEF # 23 at 1). Plaintiff argues that it faces irreparable harm because defendants have misappropriated plaintiff's "trade secret," i.e., the address of the Location and the identity of the Landlords (NYSCEF # 23, MOL, at 13-14), and additionally deprive plaintiff of "control of the Location, unique real property" (NYSCEF # 3, Landau Aff, ¶ 6). Plaintiff argues it is likely to succeed on the merits because (a) denial of the preliminary injunction would also deny it of the ultimate relief requested, which is a permanent injunction against defendants opening unless they grant plaintiff 49% equity in Qube; and (b) defendants breached the non-circumvention clause of the NDA by directly negotiating and entering an agreement with the Landlord for control of the Location (NYSCEF # 23 at 14-15). Finally, plaintiff argues that the balance of equities falls in its favor because plaintiff is merely trying to preserve the status quo, which requires defendants not to open their dispensary (*id.* at 15-16).

Defendants respond that plaintiff faces no irreparable harm because plaintiff's damages are compensable through money (NYSCEF # 36, Def Opp, at 8-9). Defendants also argue that there is no connection between plaintiff's alleged trade secret and enjoining defendants from opening (*id.*). In fact, as to the likelihood of success on the merits, defendants argue that plaintiff does not have a trade secret, because the address of the Location and its availability for rent were public facts even at the time of the NDA (*id.* at 14-15). Additionally, defendants argue that plaintiff is not entitled to 49% equity because it failed to deliver a viable lease and funding of at least $500,000 per the Corporate Resolution (*id.*). Defendants also argued at oral argument that "the Opportunity" outlined in the NDA referred to an opportunity with StubHub specifically, not an opportunity at the Location

651937/2024 NAP IV LLC, D/B/A STS MCM vs. QUBE USA LLC ET AL
Motion No. 001

Page 6 of 11

6 of 11

[* 6]

generally, and therefore defendants did not violate the NDA by negotiating directly with the Landlord. Finally, defendants argue that the equities do not lie in plaintiff's favor because defendants must open in June 2024 or else they will likely default on their rent obligations and payments to contractors performing the build-out, thus destroying the business and sending the Individual Defendants into personal bankruptcy due to their personal guarantees to the Landlords (*id.* at 9-11).

Plaintiff's reply affirmation points out that defendants have essentially admitted that they negotiated directly with the Landlords, thus violating the NDA (NYSCEF # 39, Reply Aff, ¶ 3). Plaintiff also points out that defendants admitted that they issued the Corporate Resolution and relied on the Lease in applying to OCM in August 2023, both of which prove that plaintiff offered a "viable lease" and $650,000 in buildout as required in the Resolution (*id.* ¶¶ 4-5). Plaintiff further argues that defendants have not shown that the Resolution was in any way premised on raising money beyond the $650,000 in the August Conditional Lease (*id.* ¶¶ 6-7). Plaintiff concludes that the balance of equities favors plaintiff over defendants since defendants are free to move due to the support of new and wealthy backers while plaintiff risks permanent reputational damage if the injunction is denied (*id.* ¶¶ 8-22).

*Irreparable Harm*

As a threshold matter, plaintiff did not plead a "misappropriation of trade secret" claim or otherwise mention "trade secret" anywhere in its complaint. Plaintiff fails to show irreparable harm because plaintiff has no trade secret to misappropriate. But, even if it had so pleaded, which would benefit from the presumption that a misappropriation of a trade secret is presumed irreparable (*Sylmark Holdings Ltd. v Silicone Zone Intern. Ltd.*, 5 Misc 3d 285, 299 [Sup Ct NY County 2004]), the information must first actually be a trade secret to receive this presumption. "New York courts have adopted the trade secret definition set forth in the Restatement of Torts § 757, Comment B, as 'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it'" (*Sylmark*, 5 Misc 3d at 297; *see also Ashland Mgt. Inc. v Janien*, 82 NY2d 395, 407 [1993]). There are six factors to consider when evaluating potential trade secrets:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

(*Ashland*, 82 NY2d at 407 [1993], quoting Restatement of Torts § 757, comment *b*).

651937/2024  NAP IV LLC, D/B/A STS MCM vs. QUBE USA LLC ET AL
Motion No. 001

Page 7 of 11

[* 7]

Plaintiff argues that the Location and the identity of the Landlord constituted a trade secret. More specifically, plaintiff implies in its reply affirmation that the trade secret is "a location that had a site lock preventing others from opening a dispensary within 1000 feet of the location," and "direct access" to the Landlord (NYSCEF # 39 at fn 2).

This information is not a secret. Under the first factor, "the extent to which the information was known outside the business," both the Location's address and the identity of the Landlord are well-known outside the business. Besides plaintiff and defendants, others, such as the landlord representative Charles Aini, Royal Leaf, and StubHub's broker, knew the Location and the Landlord at the time (NYSCEF # 1 ¶¶ 11, 12, 19, 34). And the "Retail Space for Lease" sign on the door of the Location is public so that those interested can contact the three brokers listed on that sign (NYSCEF #s 32 & 33). This was not an exclusive trade secret.

Moreover, plaintiff also fails to show any real "measures taken ...to guard the secrecy of the information" (Restatement § 757, comment b, factor [4]). Plaintiff's only clear step was to require defendants to sign an NDA (*see* NYSCEF # 6). But plaintiff does not explain whether it took other obvious steps to protect the information, including asking Royal Leaf to sign an NDA; inspecting the Location to verify that it was not publicly listed or advertised as for rent; after inspecting the Location, asking the Landlord or the landlord representative how many others knew that the Location was available to cannabis dispensaries; or trying to obtain some kind of exclusivity agreement regarding use of the information. Plaintiff took no basic steps to keep this a secret or even verify that it *was* a secret. Hence, there is no trade secret.

Finally, even if this were a trade secret, there is no connection between the requested injunction and the secret's protection. An injunction against defendants' opening would do nothing to keep other people from knowing the address or identities of the landlords. Plaintiff's only other argument is that allowing defendants to open would make plaintiff's request for permanent injunctive relief "ineffectual" (NYSCEF # 23 at 14). Plaintiff does not explain why its 49% equity cannot be awarded after opening or why it cannot be reimbursed in money damages for use of the information. In short, there is no irreparable harm, and therefore no reason to enjoin.

That said, while plaintiff does not address the NDA's terms, the NDA also specifies that breach "may" result in irreparable injury and that plaintiff may seek an injunction for specific performance. While it is enough to show that parties explicitly agreed that a breach creates irreparable injury (*see e.g. Reed Found., Inc. v Franklin D. Roosevelt Four Freedoms Park, LLC,* 108 AD3d 1, 7 [1st Dept 2013]; *Seitzman v Hudson Riv. Assoc.,* 126 AD2d 211, 214 [1st Dept 1987]), this case presents a different situation. Outside of disclosure of a non-existent trade secret, plaintiff's only other alleged irreparable harm is the loss of the chance to "secur[e]

**651937/2024  NAP IV LLC, D/B/A STS MCM vs. QUBE USA LLC ET AL**
**Motion No.  001**

**Page 8 of 11**

[* 8]

8 of 11

this Times Square location for another dispensary" (NYSCEF # 39 ¶ 11). But plaintiff has shown it has a right to control the rental of the Location, and even if it had some such right, that opportunity vanished the moment the Landlord and defendants signed the February Lease. An order preventing defendants from opening does not prevent the irreparable harm from occurring; it would merely trade one irreparable harm (plaintiff's loss of control over the location) for another (failure of defendants' business and personal bankruptcy for the defendants). This is not the purpose of a preliminary injunction.

*Likelihood of Success*

In determining whether a party has established a likelihood of success, "the threshold inquiry is whether the proponent has tendered sufficient evidence demonstrating ultimate success in the underlying action" (*1234 Broadway LLC v West Side SRO Law Project, Goddard Riverside Community Ctr.*, 86 AD3d 18, 23 [1st Dept 2011]). "While the proponent of a preliminary injunction need not tender conclusive proof beyond any factual dispute establishing ultimate success in the underlying action, a party seeking the drastic remedy of a preliminary injunction must nevertheless establish a clear right to that relief under the law and the undisputed facts upon the moving papers" (*id.* [internal citations omitted]).

Plaintiff is correct that defendants have conceded they directly negotiated and entered into a contract with the Landlord without plaintiff's prior written consent (*see* NYSCEF # 26 ¶¶ 40, 44, 46). Defendants' argument that the Location's rentability is public information misses the point: defendants' actions would violate the NDA's non-circumvention clause, not the confidentiality clause. But defendants' argument that "the Opportunity" in the NDA was an opportunity to sublet from StubHub, not merely to rent the Location generally as plaintiff asserts,[5] is persuasive. While this argument is marginally more persuasive, on the record before the court, both interpretations of "the Opportunity" are equally likely.

But even if plaintiff is correct that "the Opportunity" is the chance to rent at the Location generally, plaintiff nonetheless is unlikely to succeed on the merits because the ultimate relief requested (permanent injunction until it receives 49% equity in Qube) has no clear connection to the breach of the NDA. The NDA does not contain a single provision regarding equity in Qube (*see generally* NYSCEF # 6). The equity promise comes solely from the parties' oral agreement later documented in the Corporate Resolution (*see* NYSCEF # 1 ¶¶ 15, 34; NYSCEF #s 14 & 28). It is not clear why the promise in the Corporate Resolution should be imported into a remedy for breach of the NDA.

Finally, even if the equity in the Corporate Resolution could be imported into the NDA, plaintiff *still* fails to show a likelihood of success because the record

---

[5] This specific point was raised during oral argument.

651937/2024  NAP IV LLC, D/B/A STS MCM vs. QUBE USA LLC ET AL
Motion No.  001

Page 9 of 11

strongly indicates that plaintiff failed to hold up its end of the bargain. The Corporate Resolution promised to transfer equity only if plaintiff provided "a viable lease" (NYSCEF # 14 at Fourth Whereas Paragraph). Plaintiff incorrectly asserts that the August Conditional Lease was the required "viable lease" solely because the Corporate Resolution says so (*see* NYSCEF #s 14 and 28 at Fourth Whereas Paragraph ["WHEREAS [plaintiff] offered both a viable lease and funding of at least $500,000 for the Company's build-out and operations…"]). While neither the Resolution nor the parties define "viable," Merriam-Webster dictionary defines "viable" as "the ability to succeed or be sustained" ("Viability." Merriam-Webster, https://www.merriam-webster.com/dictionary/viability [retrieved May 6, 2024]).

As defendants point out, the August Conditional Lease was never actually viable. The lease would only take effect if defendants made a security deposit of $1.25 million (*see* NYSCEF # 37 at *73, *101). Defendants could not afford that price, and so that lease never took effect, making it a non-viable option. Plaintiff's evidence that it currently has the money to pay the $1.25 million deposit is unpersuasive because plaintiff offered that money on the condition that defendants change the operating agreement—an offer defendants are entitled to refuse. Plaintiff therefore never provided a viable lease and is not entitled to the pledged 49% equity. Plaintiff's argument fails on the likelihood of success prong.

*Balance of the Equities*

Additionally, the balance of the equities weighs strongly in favor of defendants who persuasively argue that they risk personal and corporate bankruptcy if they cannot open in June 2024. Per the February 2024 lease, defendants agreed to a $420,000 security deposit and $70,000 in rent per month (NYSCEF # 30, February 2024 Lease, at §§ 2[A][i], 49 [A]). The Individual Defendants also claim that they personally guaranteed $1.26 million in lease payments (NYSCEF # 26, ¶¶ 45, 49). While there is no specific term in the February Lease for $1.26 million, Exhibit F to the lease is a personal guaranty by the Individual Defendants to pay all "Fixed Rent" and "additional rent" owed under the lease (NYSCEF # 30 at *85 [Ex. F ¶ 2 (a)]). "Fixed Rent" is described in a schedule in § 2 of the lease as $840,000 for the first year (*id.* § 2 [A][i]), which, when added to the $420,000 deposit, totals $1.26 million. Defendants aver that they have also promised a total of $355,000 to contractors to build-out the Location (NYSCEF # 26 ¶ 52). If enjoined from opening in June, defendants claim they will likely default on these obligations, resulting in the death of the company and personal bankruptcy for the Individual Defendants under the personal guaranty (*id.* ¶¶ 53-58).

By contrast, plaintiff loses nothing if the injunction is denied. Plaintiff claims that it merely seeks to "preserve the status quo until such time as the parties' *respective rights to the Location* can be properly adjudicated" (NYSCEF # 23 at 16 [emphasis added]). Yet plaintiff has not alleged any rights to the Location. Plaintiff is not the landlord, has no control over the Landlord, and has never been a tenant

**651937/2024  NAP IV LLC, D/B/A STS MCM vs. QUBE USA LLC ET AL**
**Motion No. 001**

**Page 10 of 11**

10 of 11

[* 10]

with the ability to sublease. The closest plaintiff has ever come to controlling the Location was when it searched for new potential tenants while Royal Leaf had OCM site lock protection over the Location—but even then, the site lock belonged to Royal Leaf, and control of the Location belonged to the Landlord and StubHub. At no point was plaintiff anything more than a middleman. Plaintiff's work, as a middleman, does not justify an order that plaintiff is owed either equity in defendants' business or the right to decide who can rent the Location. Plaintiff has no right to either, thus the balance of equities does not fall in its favor.

Plaintiff's claim that it would suffer reputational damages if this preliminary injunction, raised for the first time in reply, is denied (NYSCEF # 39, Reply Aff, ¶¶ 13-21). The court cannot consider arguments raised for the first time in reply, but even if it could, this argument is not persuasive. The core of plaintiff's argument is that it has convinced multiple investors to (a) pledge to invest in a marijuana dispensary in Times Square and (b) invest in the New York cannabis industry more generally for "no profitable returns but valuable market insights" in the hopes of eventually investing in a Times Square dispensary (*id.* ¶ 16). Denying the injunction will "inflict permanent damage" to plaintiff's reputation and eventually "lead[] to the demise of NAP IV" (*id.* ¶¶ 20-21). This argument is vague and conclusory.

## Conclusion

In light of the foregoing, it is hereby

ORDERED that plaintiff's motion for preliminary injunction (MS 001) is denied; and it is further

ORDERED that defendants shall answer the complaint or make pre-answer motions within 20 days of the date of this order.

| 05/31/2024 | | | | | |
|---|---|---|---|---|---|
| **DATE** | | | **MARGARET A. CHAN, J.S.C.** | | |

| CHECK ONE: | ☐ CASE DISPOSED | | ☒ NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|
| | ☐ GRANTED | ☒ DENIED | ☐ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

**651937/2024   NAP IV LLC, D/B/A STS MCM vs. QUBE USA LLC ET AL**
**Motion No. 001**

Page 11 of 11

[* 11]